IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al<br><br>     Debtors<br>_____ | PROMESA<br>TITLE III<br><br>Case No. 17-bk-03283 (LTS)<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO (ERS)<br><br>     Debtors<br>================================================ | PROMESA<br>Title III<br><br>Case No. 17-bk-03566 (LTS) |
| RENÉ PINTO LUGO, et al, VAMOS, Movimiento de Concentración Ciudadana Inc., (VAMOS); Unión de Empleados de Oficina y Profesionales de la Autoridad de Edificios Públicos, (UEOGAEP); Unión Insular de Trabajadores Industriales y Construcciones Eléctricas Inc., (UITICE); Unión Independiente de Empleados de la Autoridad de Acueductos y Alcantarillados, (UIA); Unión de Empleados de Oficina Comercio y Ramas Anexas, Puertos, (UEOCRA); Unión de Empleados del Banco de la Vivienda, (UEBV); Unión de Empleados Profesionales Independientes, (UEPI); Unión Nacional de Educadores y Trabajadores de la Educación, (UNETE); and Asociación de Inspectores de Juegos de Azar, (AIJA); Asociación de Jubilados de la Autoridad de Energía Eléctrica hereinafter (AJAEE)<br><br>     Plaintiffs<br>v.<br><br>The government of the United States of America, (USA); Financial Oversight and Management Board for Puerto Rico (the FOMB);and RICARDO ROSSELLÓ NEVARES  in his official capacity.<br><br>     Defendants | Civil Number:<br><br><br>ADVERSARY<br>CIVIL ACTION |

# ADVERSARY  COMPLAINT

TO THE HONORABLE COURT

Come now Plaintiffs, through the  undersigned attorney, who respectfully state, pray,  and request as follows:

## I.  JURISDICTION AND VENUE

This Court has federal jurisdiction over the subject matter of this Adversary Complaint pursuant to 28 U.S.C. § 1331 since this action arises under the provisions of The Puerto Rico Oversight, Management, and Economic Stability Act of 2016 (hereinafter PROMESA). Section 106(a) of the Act grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part"; 48 U.S.C. sec. 2126(a). This Court also has jurisdiction over the subject matter of this Adversary Complaint because it arises out of  allegations of violations to the 1st,  5th and 14th amendments of  the Constitution of the United States among other federal legal authorities.  The venue is proper in the District of Puerto Rico pursuant to  Section 307 of PROMESA.  (48 U.S.C sec. 2167)

## II.  INTRODUCTION:

The present action seeks injunctive and declaratory relief, including the determination that certain provisions of   PROMESA, 48 USC 201 et.seq., are unconstitutional because they violate Plaintiffs' fundamental rights as protected by the First, Fifth,  and Fourteenth Amendments of  the Constitution of the United States of America, hereinafter USA,   the Declaration of Independence of the USA[1] and other  statutes   and international covenants that bind de USA. Plaintiffs represent

---

[1]As far as how the Supreme Court of the USA has taken notice and used the Declaration of Independence as a source of historical context and substantive juridical basis in constitutional law and to interpret the Constitution of the USA , see for example  Evenwal v. Abbot 136 U.S. 1120 (2016); Stern v. Marshall 131 S.Ct. 2594 (2011) United States v Cabrales 524 U.S. 1 (1998) Adarand

a wide and inclusive cross section of individual residents of Puerto Rico, and other legal

representative entities that have been, are being, and will continue to be directly and dramatically

affected by the implementation or lack of implementation of certain provisions of PROMESA

in the jurisdiction of Puerto Rico and abroad. In particular, the constitutionality of the establishment

of a Financial Oversight Management Board, hereinafter FOMB or the Board, with executive and

legislative powers over the Government of the Commonwealth of Puerto Rico, its democratically

elected officials, and the residents of Puerto Rico is contested. As an additional claim and/or in the

alternative, it is contended that the conflict of interests of various of the members of the FOMB

renders them unqualified to remain in the Board, and it prevents any and all attempts to pursue the

objectives of PROMESA and further constitutes a violation of the constitutional right to due process

of law of the Plaintiffs and the People of Puerto Rico. Moreover, even the appearance of conflict

of interest in the acts or omissions of those members of the FOMB can render any and or all acts

of the Board null and void.[2] Furthermore, we argue that the unique and novel nature of PROMESA

does not render it exempt from constitutional and fiscal scrutiny and as such cannot be construed to

preclude this Court from considering and resolving the constitutional matters presented by Plaintiffs,

particularly so after the economic and social devastation caused by hurricanes Irma and María in

---

v. Pena 515 U.S. 200 (1995); Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S.
50 (1982); Curtis Publishing v. Butts 388 U.S. 130 (1967); Gray v. Sanders, 372 US 368 (1963);
Cooper v. Aaron 358 U.S. 1 (1958); Bute v. Illinois 333 U.S. 640 (1948); Duncan v. Kahanamoku
327 U.S. 304 (1946); United States v. Curtiss-Wright 299 U.S. 304 (1936); Allgeyer v.Louisiana
165 U.S. 578 (1897); Gulf v. Ellis 165 U.S. 150 (1897); Monongahelan v. United States 148 U.S.
312 (1893); and Powell v Pennsylvania 127 U.S. 678 (1888)


[2]The Plaintiffs reserve the right to claim that the whole PROMESA statute is
unconstitutional.

Puerto Rico and the way the Government of Puerto Rico has mishandled the socioeconomic and health crisis that arose afterwards.

We also petition an order to perform an urgent integral, legal,  and  forensic audit  of the public debt which is fundamental to transparency and constitutes an essential fiduciary and statutory duty of the FOMB and the Government of Puerto Rico.[3]  We affirm   that further delaying the  audit will only aggravate the socio-economic crisis of Puerto Rico and impede  the fair and equitable fiscal reorganization  and   equitable and sustainable development and quality of life of the Plaintiffs and the People of Puerto Rico, which is, at least in paper, an integral part of the legislative intent of PROMESA.

The evident  unwillingness and failure to perform an integral and  forensic audit (as defined hereinafter) by the FOMB and the Government of Puerto Rico to deconstruct all the details of an illegal, damaging,  and unprecedented issuance of public debt, requires a judicially ordered mandate to pursue it.  The failure is more evident and suspicious given the decision not to perform the public audit  after the existing  Government of Puerto Rico  set aside in the year 2017 the Commission created by statute[4] in the year 2015 to undertake the audit.  The Commission created by law 97  had issued two  preliminary  reports  that  revealed  violations  of  law  in  borrowing  practices  by  the Government of Puerto Rico and private parties and entities.  Such forensic and legal audit is further needed  to account for the extent of the potential   wrongdoings, fraud, and  corruption over the

---

[3] As far as the audit is concerned, and the determination of the precise financial state of the Government of Puerto Rico and its public corporations, the Court should take official notice of  the failure  of the Government of Puerto Rico to comply with its obligation to prepare and publish certified financial statements for the Government of Puerto Rico and its public corporations since fiscal year 2014-2015.

[4] Puerto Rico Act 97 of July 1, 2015.

public debt of the Government of Puerto Rico, and  to specifically identify wrongdoers (persons and legal entities) that should be held liable for the issuance of the  debt.   The  lack of action in performing the  audit will impede the compliance with the ultimate goal of a bankruptcy process which is supposed to provide a  "fresh start",  "rehabilitation," and sustainable development of the "debtor". In the  absence of the aforementioned audit, it is inappropriate and  premature to consider, prepare, and adopt any  fiscal plans for Puerto Rico within the scope of the PROMESA Act to move forward and to adopt measures for an  equitable,   sustainable development,  and improved quality of life for the Plaintiffs and the   people residing in Puerto Rico. Furthermore, it would operate against  the  ultimate  purpose  of  any  bankruptcy  procedure,  including  PROMESA  Title  III proceedings, in which the present and the future of the Petitioners and  the People of Puerto Rico is at stake.

This action is also pursued because of the existing and untenable   state of control and submission in the socioeconomic and political relationship to which  the Government of the USA has subjected the Plaintiffs and  the People of Puerto Rico, relationship that is supposed to  adhere to the democratic principles and rights  that peoples and  individuals of the world are entitled to as fundamental human rights. The  neglect of those duties by the USA   require to be confronted immediately and affirmatively  rectified "with all deliberate speed".[5]

---

[5] See <u>Brown v. Bd.  of Educ.</u>, 349 U.S. 294, 301 (1955) in which the Supreme Court of the USA set aside the reprehensible,  socioeconomic, political and cultural practice pursuant to which state and local governments were allowed to promote racial separation of persons as long as they were subject to "equal" facilities, with a mandate of terminating such practice in schools "with all deliberate speed". Plaintiffs believe that the inequities and anti democratic relationship to which the USA has subjected Puerto Rico is as reprehensible, constituting the imposition of the FOMB the latest act in that respect, relationship and imposition that should be rectified "with all deliberate speed".   See Torruella, <u>Why Puerto Rico Does Not Need Further Experimentation with its Future: A Reply to the Notion of "Territorial Federalism"</u> 131 Harv.  Law Rev.  66, at page 68 (2018).

In light of the considerations set forth above, the Plaintiffs request from the Court the following remedies:

1) To declare the imposition of the FOMB over Puerto Rico by the US Congress as an illegal, void, and unconstitutional action in violation of the Declaration of Independence of the USA, the First, Fifth, and Fourteenth Amendments of the Constitution of the USA, the Charter of the United Nations, the Declaration of Human Rights of the United Nations, and the International Covenant of Civil and Political Rights;

2) In the alternative, to the extent the Court denies the remedies set forth above, to remove two of the members of the FOMB, José Ramón González and Carlos García, due to the conflicts of interests they have that impede their participation in the FOMB, and as a result of the fact that due to those conflicts and given the powers of the FOMB, their participation in that Board constitutes a violation of the due process of law;

3) To stay the adoption of any and all fiscal plans and any and all negotiations of the payment and/or adjustment of the public debt of Puerto Rico until after an independent, integral, legal, and forensic audit of such debt is undertaken to determine what part of the debt is actually illegal, and so those persons and entities who are responsible for proceeding with the illegal sale of bonds be held accountable for such transactions and liable for the consequences of such sales;

4) To include the government of the USA as a party to this case to not only assume a position with respect to the constitutional claims made by the Plaintiffs, but also to answer the allegations of the complaint, and to assume any and all constitutional and legal liabilities it should be compelled to assume over the public debt of the government of Puerto Rico and the illegal and unconstitutional imposition of the FOMB over the Plaintiffs, Puerto Rico, and its residents; and

5) To bar the Government of Puerto Rico from disposing of the totality and/or part of the Puerto Rico Electrical Power Authority without complying with the Constitution of Puerto Rico and the right of the Plaintiffs and the People of Puerto Rico to participate in the decisions regarding the preservation, management and disposition of its most important essential service and natural resource, in addition to the water resources.

## III.    THE PARTIES

## A.    PLAINTIFFS

1.      Plaintiff, René Pinto-Lugo is of legal age, married, attorney at law, and resident of San Juan, Puerto Rico.  He is also a creditor of the Commonwealth of Puerto Rico as a bond holder and as such has legal standing in this legal action.

2.      Plaintiff, VAMOS, Movimiento de Concertación Ciudadana Inc., hereinafter VAMOS  is a non for profit corporation organized pursuant to the laws of Puerto Rico  and a party with interest and   standing in this case inasmuch as among other activities, it provides educational and logistical support to community based organizations and  it organizes community based socioeconomic and cultural groups whose constitutional and statutory rights are being violated by the actions undertaken by the FOMB, and it is also an advocate of the claims set forth herein.

3.      Plaintiff,   Unión de Empleados de Oficina y Profesionales de la Autoridad de Edificios Públicos, hereinafter UEOPAEP,  is a labor union franchised under the Puerto Rico Labor Management Relations Act, Act  130 of May 8, 1945 (29 L.P.R.A. §§61 et seq.), that represents approximately 120 employees of the Administración de Edificios Públicos, in English Public Buildings Authority of the Commonwealth of Puerto Rico (hereinafter PBA), which is a public corporation created pursuant to act (22 L.P.R.A. §§ 902, et seq.). The PBA and UEOPAEP are

7

signatories to a collective bargaining agreement negotiated in the exercise of the workers'
constitutional right to collective bargaining under the Constitution of the Commonwealth of Puerto
Rico. The PBA is a public corporation of the Commonwealth of Puerto Rico with legal capacity to
sue and be sued.  It oversees designing, building, managing, leasing and purveying maintenance to
public facilities leased by other public agencies, including departments of the Executive Branch,
courts of law, police stations, firehouse stations, most public schools in Puerto Rico and other public
corporations of the Commonwealth of Puerto Rico.  The UEOPAEP has legal standing as a party to
this action since it has pending claims against the PBA under its Collective Bargaining Agreement
(CBA) and insofar as the PBA and the Commonwealth of Puerto Rico have undertaken unilateral
actions to freeze and stay several economic and non-economic provisions of the CBA and other
rights recognized by Puerto Rican statutes allegedly because of the fiscal crisis of the government
of Puerto Rico.  Those actions have caused damages to Union members and their families that are
estimated in hundreds of thousands of dollars and have constituted a breach in the CBA and a
violation of the statutory, constitutional and civil rights of said Union members.

4.      Plaintiff, Unión Insular de Trabajadores Industriales y Construcciones Eléctricas Inc.,
hereinafter UITICE, is a labor union franchised under the Puerto Rico Labor Management Relations
Act, Act 130 of May 8, 1945 (29 L.P.R.A. §§61 et seq.), that represents approximately 900
employees of the Puerto Rico Energy and Power Authority, hereinafter PREPA, which is a public
corporation created pursuant to Act 83 of May 2, 1941, as amended (22 L.P.R.A. §§ 191, et seq.).
That public entity of the Commonwealth of Puerto Rico has capacity to sue and be sued and oversees
the generation, distribution and sale of electric energy in Puerto Rico.   UITICE has legal standing
as a party to this action since it has pending claims against PREPA under its CBA and since PREPA

and the Commonwealth of Puerto Rico have undertaken unilateral actions to freeze and stay a series

of economic and non-economic provisions of the CBA, allegedly because of the fiscal crisis of the

government of Puerto Rico.  Said actions have caused damages to the Union members that are

estimated in hundreds of thousands of dollars and have constituted a breach of the CBA and a

violation of the statutory, constitutional and civil rights of Union members.

5.      Plaintiff,   Unión Independiente de Empleados of the Puerto Rico Water and Sewer

Authority, hereinafter UIA, is a labor union franchised under the Puerto Rico Labor Management

Relations Act, Act 130 of May 8, 1945 (29 L.P.R.A. §§61 et seq.), that represents approximately

4,500 employees of the Puerto Rico Water and Sewer Authority, hereinafter PRASA.  PRASA is a

public corporation created pursuant to Act 40 of May 1, 1945 (22 L.P.R.A. §§141 et seq.). As an

entity of the Commonwealth of Puerto Rico, it has legal capacity to sue and be sued.  It is responsible

for the production, distribution and sale of potable water and the collection, treatment and disposition

of sewage waters in Puerto Rico. As an entity of the Commonwealth of Puerto Rico, it has legal

capacity to sue and be sued.  It is responsible for the production, distribution and sale of potable

water and the collection, treatment and disposition of sewage waters in Puerto Rico.  UIA has legal

standing as a party to this action since it has pending claims against PRASA under its CBA and

because PRASA and the Commonwealth of Puerto Rico have undertaken unilateral actions to freeze

and stay several economic and non-economic provisions of the CBA and other provisions of law,

allegedly as a result of the fiscal crisis of the government of Puerto Rico, actions that have caused

damages to the Union members that are estimated in millions of dollars and have constituted a

breach of the CBA and a violation of statutory, constitutional and civil rights of the Union members.

6. Plaintiff,  Unión de Empleados de Oficina Comercio y Ramas Anexas, Puertos, hereinafter

UEOCRA  is a labor union  franchised  under the Puertor Rico  Labor Management Relations Act,

Act 130 of May 8, 1945 (29 L.P.R.A. §§61 et seq.), that represents approximately 300  employees

9

of the Puerto Rico Ports Authority of the Commonwealth of Puerto Rico (hereinafter PRPA) which is a public corporation created pursuant to act Act 127 of May 7, 1942 (23 L.P.R.A. §331). That government entity of the Commonwealth of Puerto Rico has legal capacity to sue and be sued and it is in charge of the management of the public airports and ocean ports of the government of Puerto Rico. UEOCRA has legal standing to be a party to this action since it has pending claims against the PRPA under its CBA and insofar as the PRPA and the Commonwealth of Puerto Rico have undertaken unilateral actions to freeze and stay several economic and non economic provisions of the CBA and other provisions of law, allegedly because of the fiscal crisis of the Government of Puerto Rico. Said actions have caused damages to the Union members that are estimated in millions of dollars and that have constituted a breach of the CBA and a violation of the constitutional and civil rights of the union members.

7. Plaintiff, Unión de Empleados del Banco de la Vivienda, hereinafter UEBV is a labor union franchised under the Puerto Rico Labor Management Relations Act, Act 130 of May 8, 1945 (29 L.P.R.A. §§61 et seq.), that represents approximately 50 employees of the Housing Bank of the Commonwealth of Puerto Rico (hereinafter HB) which is a public corporation created pursuant to Act 103 of August 11, 2001 (7 L.P.R.A. §924 et seq.). The HB has legal capacity to sue and be sued and it oversees financing the development of low income housing projects and the purchase of housing units by low income families in Puerto Rico. The UEBV has legal standing to be a party to this action because it has pending claims against the HB under its CBA and since the HB and the Commonwealth of Puerto Rico have undertaken unilateral actions to freeze and stay a series of economic and non economic provisions of the CBA, allegedly because of the fiscal crisis of the Government of Puerto Rico. Said actions have caused damages to the Union members that are estimated in hundreds of thousands of dollars and that have constituted a breach of the CBA and a violation of the constitutional and civil rights of the Union members.

8. Plaintiff  Unión de Empleados Profesionales Independientes, hereinafter UEPI, is a labor union franchised  under the Puerto Rico  Labor Management Relations Act, Act 130 of May 8, 1945 (29 L.P.R.A. §§61 et seq.), that represents approximately 400  employees of PREPA.  PREPA is a public corporation  of the Commonwealth of Puerto Rico has the legal capacity to sue and be sued and it oversees  the generation, distribution,  and sale of the electric energy in Puerto Rico.  The UEPI has legal standing as  a party to this action since  it has pending claims against PREPA under its CBA and since  PREPA and the Commonwealth of Puerto Rico have undertaken unilateral actions to place in suspense a series of economic and non economic provisions of the CBA, allegedly because of  the fiscal crisis of the Government of Puerto Rico.  Such  actions  have caused damages to the Union members that are estimated in millions of  dollars and that have constituted a breach of  the CBA and a violation of the constitutional and civil rights of the Union members.

9.  Plaintiff, Unión Nacional de Educadores y Trabajadores de la Educación , hereinafter UNETE,  is a *bona fide* labor organization  that represents  approximately 450  employees of the Department of Education  of the Commonwealth of Puerto Rico (hereinafter DEPR) which is a goverment agency created pursuant to Act 149 of July 15, 1999 (3 L.P.R.A. §143a et seq.) The DEPR,  is a public entity  of the Commonwealth in charge of  the educational services and management of all public schools of Puerto Rico. UNETE has legal standing to be a party to this action inasmuch as it has pending claims against the DEPR  and insofar as the DEPR and the Commonwealth  have undertaken unilateral actions to freeze and stay a series of economic and non economic provisions of the statutes that regulate the salary and working conditions of the members of UNETE, allegedly as a result of the fiscal crisis of the Government of Puerto Rico.  Said actions have caused damages to the UNETE members that are estimated in hundreds of thousands of  dollars and that have constituted  violations of the constitutional and civil rights of the UNETE members.

11

10.     Plaintiff,  Asociación de Inspectores de Juegos de Azar, hereinafter AIJA is a labor union franchised under the Puerto Rico Labor Management Relations Act, Act 130 of May 8, 1945 (29 L.P.R.A. §§61 et seq.), that represents approximately 80 employees of the Puerto Rico Tourism Authority (hereinafter PRTA) which is a public corporation created pursuant to Act 10 of June 18, 1970 (23 L.P.R.A. §§671 et seq). The PRTA, is a public entity of the Commonwealth of Puerto Rico that has legal capacity to sue and be sued and is responsible in charge of implementing public policy regarding the promotion of tourism in Puerto Rico and the regulation of tourist facilities and casinos. The AIJA has legal standing to be a party to this action inasmuch as it has pending claims against the PRTA under its CBA and insofar as the PRTA and the Commonwealth of Puerto Rico have undertaken unilateral actions to freeze and stay a series of economic and non economic provisions of the CBA, allegedly as a result of the fiscal crisis of the Government of Puerto Rico. Said  actions have caused damages to the Union members that are estimated in hundreds of thousands of dollars and that have constituted a breach of the CBA and a violation of the constitutional and civil rights of the Union members.

11.   Plaintiff,  Asociación de Jubilados de la Autoridad de Energía Eléctrica, hereinafter AJAEE, is a non-profit corporation that represents approximately more than 5,000 retired employees of PREPA, with vested rights as former employees of PREPA as part of a pension fund created by statute and also protected under collective bargaining agreements reached with the corresponding labor unions that represent employees in PREPA.   In violation of the terms of the corresponding CBAs and its legally binding fiduciary obligations, PREPA has failed to make the corresponding pension benefit payments owing millions of dollars to the fund and to the members of the AJAEE as of the date of this complaint.

B.  DEFENDANTS

1. The United States of America, hereinafter USA,   is a federal republic of fifty states organized pursuant to a government structure  of three inter independent branches of government: an executive, legislative,  and judicial branch. Its executive component enforces the laws enacted by Congress within the scope of a constitutional authority.  Its legislative component has the power to investigate public matters,  to enact laws,  and to make public policy determinations.  The judicial branch has the power to address, consider,  and adjudicate controversies between natural and juridical entities and  persons, and between those persons and entities  and the government of the USA or the government of the states and their municipalities,  within the scope of the powers granted by the Constitution and certain statutes. That branch also has the power to  interpret the Constitution, the laws and the regulations adopted by government while adjudicating those controversies.  Insofar Congress approved the patently unconstitutional law PROMESA, the Act that we are asking the judicial branch of the USA  to scrutinize under its Constitution, laws and other covenants,  Plaintiffs include the USA as  a party to this action given the content and nature of the  claims made against the Government of the USA and the remedies requested accordingly.  Pursuant to Rules  5.1 and Rule 19 of the Federal Rules of Civil Procedure, hereinafter (FRCP),  the USA has to be a party to this action.

2. Defendant, the Financial Oversight and Management Board for Puerto Rico (hereinafter FOMB or Board) was created under Section 101(b)(1) of PROMESA  as an "entity within the [Commonwealth] government" with fiduciary duties to represent the Commonwealth of Puerto Rico. (48 U.S.C. sec. 2121) Pursuant to the PROMESA statute, the FOMB is granted full responsibility to promote and achieve economic stability of Puerto Rico and to regain its government's access to financial markets.  It is included in this case as a party insofar as the constitutionality of its creation

13

by a statute enacted by the US Congress is herein being challenged.   Accordingly, it is an indispensable party to this action pursuant to Rule 19 of the FRCP.

3. Defendant,   RICARDO ROSSELLÓ NEVARES ( hereinafter Governor Rosselló or Rosselló) is the elected  Governor of the Commonwealth of Puerto Rico. Plaintiffs sue Governor Rosselló in his official capacity  given his fiduciary obligations and the constitutional and statutory duties he is obliged to  comply with in order to  safeguard  the best interests of the People of Puerto Rico and its residents.    Among the obligations he has Plaintiffs include the obligation under PROMESA to prepare and submit fiscal plans for the consideration, approval and certification by the  FOMB.  As such, the Governor is an indispensable  party that must be joined  pursuant to Rule 19 of the FRCP.

## IV.  HISTORICAL CONTEXT OF CONTROVERSY[6]

On July 25, 1898, as part of the Spanish American War, the USA invaded Puerto Rico. The invasion was led by General Nelson A. Miles who upon arrival issued  a public  proclamation  to the People of Puerto Rico which stated in  part the  following:

> "**We have not come to make war upon the people of a country** that for centuries has been oppressed, but, on the contrary, to bring you protection, not only to yourselves but to your property, **to promote your prosperity**, **and to bestow upon you the immunities and blessings of the liberal institutions of our government**." Emphasis added.

In his proclamation as quoted, General Miles acknowledged that **Puerto Rico was a country.** The fact that Puerto Rico is a country has also been acknowledged by the Supreme Court of the United States. That fact has been acknowledged by Congress,  as part of its Congressional Record while the Foraker Act was being considered in the year 1900 to establish a civil government in

---

[6]See also Torruella, supra, for an in depth historical account pages 70 through 89.

Puerto Rico and it has been acknowledged by the executive branch of the USA including its Department of Justice.

As of July 25, 1898, the People of Puerto Rico was, and still is,  a nationality,  that enjoyed an autonomous form  of self-government with the Kingdom of Spain.  At that time  the inhabitants of Puerto Rico,  as a People,  had their own national and ethnic identities, a language, customs, and culture. The autonomous form of self government in effect before the Spanish American War was established pursuant to a legal act by the government of Spain known as the  Autonomy Charter of 1897. Pursuant to the terms of that Charter, the People of Puerto Rico had a form of self government, with the election of representatives and a legislative body, enjoying the power to  adopt their own laws, to determine what laws of Spain were applicable in Puerto Rico, and among other powers the authority to enter into commercial relations with any country of the world.  Pursuant to the Charter, as of July 25, 1898, Puerto Rico had its own government, structured as a modern  political system with political parties in  a democratic electoral process.

In August 1898 the Spanish American War ended and on December 12, 1898, the Kingdom of Spain and the USA entered into a Peace Treaty pursuant to which Puerto Rico and  other territories  under  Spanish sovereignty  in the Pacific Ocean, were assigned to the United States. The People of Puerto Rico did not take part of the Treaty nor of its negotiation, nor were  any elections, referendums, plebiscites or democratic processes  undertaken in Puerto Rico to determine whether the People of Puerto Rico would accept, agree to,  or form part of the Treaty. After the end of the Spanish American War in 1898,  the armed forces of the United States that invaded and occupied Puerto Rico, displaced the government of Puerto Rico that had been established pursuant to the Autonomy Charter.

15

Nowhere in the Declaration of Independence of the USA nor in its Constitution is there any reference as to the right, power, or authority of the USA to invade the territories of other countries and/or peoples,  to acquire them as property or  possessions and/or to impose upon their peoples colonial governments or regimes. Notwithstanding that fact, pursuant to the terms of the Treaty of Paris, and specifically Article IX, the civil rights and political conditions  of the inhabitants of the territories ceded pursuant to the treaty to the USA were going to be determined by Congress.  That provision included the inhabitants of Puerto Rico.   The United States Congress ratified the Treaty of Paris on April 11, 1899.

After the end of the Spanish American War, the People of Puerto Rico were ruled by a military regime  subject to the authority of the armed forces of the USA, until the year 1900, when a civil government  was created pursuant to an act of Congress known as the Foraker Act.  While the  government of Puerto Rico between the year 1898 and the year 1900 was ruled by the armed forces of the USA,  at no point during that period of time were the People of Puerto Rico allowed to decide through a democratic process about the  adoption of  the rules, laws,  and regulations pursuant to which the public affairs of Puerto Rico were going to be managed.

At the time of the adoption of the Foraker Act,  the citizenship of the inhabitants of Puerto Rico was that of Spain, in the case of those born in Spain, or of the countries where they may have been born, but the citizenship of those born in Puerto Rico was the citizenship of the territory of Puerto Rico, even though Puerto Rico did not have its own form of independent or autonomous government after the adoption of the Treaty of Paris,  because the autonomous government of Puerto Rico was overthrown by the armed forces of the USA.   Insofar Congress recognized that the People of Puerto Rico had their own citizenship, the USA, through Congress,  recognized that the People of Puerto Rico was a distinct  ethnic group and nationality.

16

In the Declaration of Independence, the first act of self-determination of the USA, the

Founding Fathers of the USA set forth:

> "We hold these truths  to be self evident, **that all men  are created
> equal, that they are endowed by their Creator with certain
> unalienable rights, that among these are life, liberty, and the
> pursuit of Happiness. That to secure these rights, governments
> are instituted among men, deriving their  just powers from the
> consent of the governed**; that whenever any form of government
> becomes destructive of those ends, it is the Right of the people to
> alter or to abolish it; and to institute new government, laying its
> foundation on such principles, and organizing its powers in such
> form, as to them shall seem most likely to effect their safety and
> happiness".  Emphasis added.

Despite those self evident truths set forth in the Declaration of Independence and in particular

the principle that to secure those rights, governments are instituted among men, **deriving their  just**

**powers from the consent of the governed**,  ever since the end of the Spanish American War the

government of the USA has treated the People of Puerto Rico  in open disregard to their dignity and

their right to institute their own government deriving its powers from their own consent. Despite

those self evident truths set forth in the Declaration of Independence, Congress pursuant to the terms

of the Foraker Act, as if the People of Puerto Rico were not able to govern themselves, did  not allow

the People of Puerto Rico to constitute their own government deriving the power of that government

from their consent.  They were only allowed to elect representatives for a local legislative body (a

house of delegates or representatives),  to adopt laws on local matters as long as they were not

inconsistent with the laws and the Constitution of the USA, and subject to the veto power of the

governor of Puerto Rico, who was appointed by the President of the USA.

Pursuant to the Foraker Act, the chief executive officer of the government  of Puerto Rico,

the members of the government cabinet and the judges of the Supreme Court of Puerto Rico were

appointed by the President of the USA.  The members of the government cabinet integrated the upper

legislative chamber of the government of Puerto Rico.  Furthermore, the laws of the USA as

approved by Congress were made applicable to Puerto Rico unless Congress determined otherwise,

and the People of Puerto Rico were not allowed through any democratic mechanism to participate

in the process pursuant to which that legislation was enacted and approved.

Ever since the end of the Spanish American War, the USA has exercised the power of

eminent domain over  the territory of Puerto Rico to occupy real estate and own and control

buildings and properties for civil government and military purposes. As part of that power the

government of the USA has had several military bases (naval, air, and army)  in Puerto Rico

throughout the twentieth century until the present time.  That power has been exercised under the

provisions of Article  IV Section 3 clause 2 of Constitution of the United States, known as the

property or territorial clause of the Constitution of the USA.

After the approval of the Foraker Act, the Supreme Court of the United States ruled upon

several controversies regarding the legal status of the People of Puerto Rico, the territory of Puerto

Rico,  and the power of the USA over  Puerto Rico and its territory.  Those cases are known as the

Insular Cases.  (See among other cases De Lima v. Bidwell 182 U.S. 1 (1901) and Downes v.

Bidwell, 182 US 244 (1901). In those cases through majority opinions the Supreme Court decided

that the USA had the power to acquire foreign territories and to rule upon the peoples of those

territories as it may deem in its interest.[7]  The Insular Cases, reflect the interpretation, at different

---

[7]From those cases has come the notion that the United States Congress has plenary powers
over the People of Puerto Rico. See analysis in that respect by former Governor of Puerto Rico
Acevedo-Vilá, With Plenary Powers Comes Plenary Responsibility: Puerto Rico´s Economic and
Fiscal Crisis and the United States, 85 University of Puerto Rico Law Review 729 (2016) and former
Chief Justice of the Supreme Court of Puerto Rico, Trías Monge, Puerto Rico: The Trials of the

times after the   occupation by the USA of Puerto Rico in 1898, of the extent to which the

Constitution of the United States applies to its possessions and/or territories.  Essentially, the insular

Cases decide that only fundamental constitutional rights extend to unincorporated United States

territories, whereas in the incorporated territories all constitutional provisions are in force.  See for

instance  Balzac v. Puerto Rico, 258 U.S. 298 (1922). In Balzac, supra, the Court determined that

Puerto Rico was an unincorporated territory. The Court further decided that Congress can

discriminate against the unincorporated territory and its citizens using a minimum or rational basis

of constitutional scrutiny.  See in that respect  Califano v. Torres 435 U.S. (1974) and  Harris v.

Rosario 446 U.S. 651 (1980). Meanwhile, in incorporated territory the strictest scrutiny will apply.

In Torres v. Puerto Rico  442 U.S. 465 (1979), Justice Brennan wrote a concurring opinion, agreeing

with what Justice Black said in Reid v. Covert 354 U.S. 1 (1957) setting forth the following:

> Whatever the validity of the old cases such as Downes v. Bidwell,
> 182 U. S. 244 (1901), Dorr v. United States, 195 U. S. 138 (1904),
> and Balzac v. Porto Rico, 258 U. S. 298 (1922), in the particular
> historical context in which they were decided, those cases are clearly
> not authority for questioning the application of the Fourth
> Amendment— or any other provision of the Bill of Rights—to the
> Commonwealth *476 of Puerto Rico in the 1970's. As Mr. Justice
> Black declared in Reid v. Covert, 354 U. S. 1, 14 (1957) (plurality
> opinion): "[N]either the cases nor their reasoning should be given any
> further expansion. **The concept that the Bill of Rights and other
> constitutional protections against arbitrary government are
> inoperative when they become inconvenient or when expediency
> dictates otherwise is a very dangerous doctrine and if allowed to
> flourish would destroy the benefit of a written Constitution and
> undermine the basis of our Government**." at 475-476. (Emphasis
> added.)

_____

Oldest Colony of the World, 48-51 (1997).

The absurdity of the legal rationale of the Insular Cases reaches the extreme example of territorial discrimination if we consider that a  United States citizen who moves from New York to Irak,  or Cuba, may continue to vote in Presidential elections.  However, if that  same citizen moves to Puerto Rico he or she  loses the right to vote. Consejo de Salud Playa de Ponce v. Rullan, 586 F. Supp.2d 22 (D.P.R. 2008).  Evidently, the Supreme Court decided the Insular Cases notwithstanding the fact that the Declaration of Independence and the Constitution of the USA do not grant such power to the USA.  In fact, the moral and  legal principles and the spirit of the Declaration of Independence prohibit the USA from engaging in such conduct.

Since the Insular Cases the only political and representative participation Congress has allowed to the People of Puerto Rico in the matter of the enactment of laws by Congress has been that of allowing the People of Puerto Rico to elect a congressional  delegate  called Resident Comissioner. The delegate is allowed to participate in the House of Representatives of the United States Congress with a right to have voice in the House but no  right to vote.  In  1917, Congress adopted new legislation, the Jones Act,   pursuant to which the People of Puerto Rico were allowed to elect the members of the higher legislative branch of Puerto Rico, the Senate,  and Congress further imposed on the People of Puerto Rico the citizenship of the USA.  Through the approval of the Jones Act, Congress also extended  a series of rights  that were going to be applicable to the People of Puerto Rico, rights based on the Bill of Rights of the Constitution of the USA  that included, among others: the right of every person not to be deprived of life, liberty or property without due process of law, that no law can be approved to impair the value of contracts, that no property will be taken for public use without fair compensation, that no laws were going to be approved to curtail the freedom of expression, and that the privileges and immunities of the citizens

20

of the USA in Puerto Rico were going to be respected in the same way as if Puerto Rico was part of the USA.   As part of the Jones Act, Congress  allowed the government of Puerto Rico  to finance its infrastructure and development by the borrowing  money  issuing bonds that were granted triple exemption.  That triple exemption meant that the interest earned from the bonds were going to be exempt from the payment of any taxes by the federal,  state, and local authorities regardless of where the bond holder resides, including taxes by Puerto Rico and its municipalities.

In the year 1920, through another statute also known as Jones Act or Merchant Marine Act of 1920, Congress imposed on the People of Puerto Rico and its territory the requirement that all goods transported by water between U.S. ports to  be carried on U. S.  flag ships, constructed in the United States, owned by U.S. Citizens, and crewed by U.S. citizens and U.S. permanent residents. Such requirements restrain the right of the People of Puerto Rico to freely engage in maritime commerce with marine merchants from any part of the world. In  1940, through another  act of Congress, anyone born in the territory of Puerto Rico became thereafter automatically a citizen of the USA.

In the year 1945, after World War II, the USA became one of the countries that formed part of the United Nations, adopting the terms of the United Nations Charter. Pursuant to the terms of the United Nations Charter, the USA agreed, among other objectives, **to promote through the United Nations with a view to the creation of conditions of stability and well being necessary for peaceful and friendly relations among nations based on respect for the principle of equal rights and self determination of peoples, universal respect for and observance of human rights and fundamental freedoms for all** without distinction as to race, sex, language, or religion.  Emphasis added.  The terms of the United Nations Charter were  subscribed by the President of the United

States and were approved and ratified by the required two thirds of the Senate of the United States

Congress. (Charter of the United Nations, June 26, 1945, 59 Stat. 1031, 1213, T.S.No.993 (effective

Oct. 24, 1945)

Article 73 of the Charter expressly provides that members of the United Nations which have

or assume **responsibilities for the administration of territories whose peoples have not yet**

**attained a full measure of self-government recognize the principle that the interests of the**

**inhabitants of these territories are paramount, and accept as a sacred trust** the obligation to

promote to the utmost, within the system of international peace and security established by the

present Charter, the **well-being of the inhabitants of these territories**, and, to this end:

a. **to ensure, with due respect for the culture of the peoples concerned, their political, economic, social, and educational advancement, their just treatment, and their protection against abuses**;

b. **to develop self-government, to take due account of the political aspirations of the peoples, and to assist them in the progressive development of their free political institutions**, according to the particular circumstances of each territory and its peoples and their varying stages of advancement;

c. to further international peace and security;

d. to promote constructive measures of development, to encourage research, and to co-operate with one another and, when and where appropriate, with specialized international bodies with a view to the practical achievement of the social, economic, and scientific purposes set forth in this Article; and

e. to transmit regularly to the Secretary-General for information purposes, subject to such limitation as security and constitutional considerations may require, statistical and other information of a technical nature relating to economic, social, and educational conditions in the territories for which they are respectively responsible... (Emphasis added)

22

To the extent the United Nations Charter is a Treaty, it is an accord, it is a  contract[8] between the nations that have adopted and joined it, and as a contract it is a promise and a duty by each nation including the USA,  that it will comply with it. The principles, objectives, and purposes  set forth in the United Nations Charter, are human, moral,  and legal  principles, that all human beings and peoples of the world are  entitled to before the creation of the United Nations, and even before the adoption in the USA of its Declaration of Independence on July 4, 1776. In fact, those are human rights and moral principles of mankind from the beginning of human civilizations.

Before the creation of the United Nations and in particular since the 1930´s the government of the USA by itself and in complicity with  the local authorities of Puerto Rico and the governments of Puerto Rico has persecuted, repressed, and violated the freedom of expression and civil rights of individuals and organizations that have advocated the self determination of the People of Puerto Rico.  In fact,  since the 1930´s,  all attempts by individuals, groups, and/or organizations in Puerto Rico and by Puerto Ricans in the United States to promote the self-determination of the People of Puerto Rico have been disregarded and/or repressed by the government of the USA.

Despite the promise agreed by the USA  **to  promote through the United Nations with a view to the creation of conditions of stability and well being necessary for peaceful and friendly relations among nations based on respect for the principle of equal rights and self determination of peoples, universal respect for and observance of human rights and fundamental freedoms for all,** the government of the USA has disregarded and violated that promise as far as the People of Puerto Rico are concerned, but for menial powers delegated regarding

---

[8]Mahoney, Treatises as Contract; Textualism, Contract Theory, and the Interpretation of Treaties 116 Yale Law Journal 824 (2007).

23

local affairs, and subject to the laws and Constitution of the USA and the power of the government of the USA.

In  1948, through an  act of  Congress the  People of Puerto Rico were allowed to exercise the right to elect their own governor,  and since the 1948 election,  the People of Puerto Rico have had the  opportunity to elect their own governor every four years. In the year 1951    Congress approved Act 600  (Puerto Rico´s Federal Relations Act of 1950), pursuant to which the People of Puerto Rico were allowed to adopt their own constitution and to organize their own form of local government, subject to the approval of  Congress.  In the Act Congress provided that whatever constitution the  People of  Puerto Rico  would adopt,  it had  to  include a  republican form of government and a bill of rights in compliance with the Constitution of the USA. Thereafter, the government of Puerto Rico has been named The Commonwealth of Puerto Rico.

Upon approval of Act 600, and as set forth in the Congressional Record, no changes were made in the political, economic,  and military relations between Puerto Rico and the USA, inasmuch as after the approval of Act 600, the United States continued exercising the same powers, controls, and prerogatives it had since the year 1900 over the People of Puerto Rico.  In fact, although this legislation  delegated additional powers to the Puerto Rican people, it did not change the territorial status of Puerto Rico. The House and Senate Committee Reports both stated that the law "would not change Puerto Rico's fundamental political, social and economic relationship to the United States." H.R. Rep. No. 81-2275 at 3 (1950); S. Rep. No. 81-1779 at 3 (1950). It also made clear that the law in no way "precludes a future determination by the Congress, of Puerto Rico's ultimate political status." H.R. Rep. No. 81-2275 at 3; see also S. Rep. No. 81-1779 at 4.  Even though Act 600 did not alter the nature of the colonial relationship between Puerto Rico and the USA, the latter represented before the United Nations that as a result of Act 600 and the adoption of a constitution,

24

the People of Puerto Rico had exercised a form of local self government as a result of which Puerto Rico ceased to be considered at the United Nations as a colonial territory. Thereafter, the USA has not filed the reports required by Article 73(e) of the United Nations Charter.

Notwithstanding such representations the People of Puerto Rico, through its government since 1952 have made attempts in Congress to change the relationship with the USA by the acquisition of more political powers during the 1950´s, 1960´s, and 1970´s, and all such efforts were disregarded by the government of the USA.  Moreover, in 1989 the three main political parties of Puerto Rico that represented the three alternatives considered to resolve the problem of the relationship between Puerto Rico and the USA, through statehood, an enhanced form of Commonwealth with more political powers or independence, reached a procedural  agreement to attempt to reach a process to resolve once and for all the colonial problem.  They brought the agreement to the attention of Congress and after engaging in efforts for two years to get a bill approved, those efforts were disregarded by Congress.  Likewise, efforts undertaken by the leadership of the party that wants Puerto Rico to become a state since the year 2007 in Congress through the Resident Commissioner, position that such party has controlled since 2005, have also been disregarded by Congress, and none of the bills presented and lobbying efforts have produced any results.

When the Commonwealth of Puerto Rico was created pursuant to the law adopted by Congress that allowed the People of Puerto Rico to adopt its own Constitution, Puerto Rico was allowed to continue borrowing through the issuance of bonds subject to the limitation that the amount payable for such public debt in the year immediately before the current year for principal and interests regarding obligations guaranteed by the Commonwealth could not exceed 15% the average yearly revenue of the two prior years of the Commonwealth.  Furthermore, no bonds or promissory

25

notes payable by the Commonwealth could be due beyond thirty years except those to finance housing facilities that could reach forty years.  Moreover, the Commonwealth cannot guarantee any amount of bonds or notes payable if the amount payable on any such outstanding debt exceeds in any given year 15% of that yearly revenue.  See section 3 of Article VI of the Constitution of Puerto Rico.  It is important to emphasize that the Puerto Rican Constitution was enabled by virtue of Law 600, subject to the modification and approval of Congress. Such limitations, conditions, and the singular circumstances make the Puerto Rican Constitution a by product of federal legislation and as such an Act of Congress.

As of the year 1984, the Bankruptcy Laws of the USA applied to Puerto Rico that formed part of  Chapter 9 of the   bankruptcy provisions of the Bankruptcy Act. In the year 1984, as part of a series of changes adopted by Congress in the Bankruptcy Act, Puerto Rico was removed from the applicable provisions of Chapter 9 of the Bankruptcy Act and as part of the Congressional Record, no reference, mention, or statement was made as to the reasons why the US Congress was undertaking such removal  from the Bankruptcy Act. See Commonwealth of Puerto Rico v.  Franklin California Tax-Free Trust, 136 S.Ct. 1938 (2016), dissent by Justice Sotomayor footnote 1 at page 1951. Since then Puerto Rico was deprived of a legal means to restructure its debts and to reorganize its economy.

Insofar  as Puerto Rico is  a territory of the USA according to Congress, the executive branch of the federal government and the Supreme Court of the United States, any and all acts enacted by Congress regarding Puerto Rico have been acts undertaken  pursuant to Article IV, Section 3,  clause 2 of the Constitution of the USA, which provides Congress the power to dispose of and make all **needful rules and regulations** for the territories of the USA.  Emphasis added.

26

In the context of this history, and considering the way the Insular Cases have been used as a way of subjecting the People of Puerto Rico to a second class citizenship and to a relationship devoid of the right to fully participate in the decision making processes regarding their socioeconomic and political past, present and future, in other words in a fully democratic manner, should lead any court of law to confront that state of affairs to produce a just and equitable outcome changing such circumstances. To do so it is necessary to engage in an interpretation of the law and the Constitution of the USA and its history from the perspective and the recognition that equal rights should be interpreted with regard to current standards of equality, not those of decades or centuries ago, because the consequences of such consideration would equate to a miscarriage of justice. In other words life, liberty, and the pursuit of happiness  in 1791 was never thought to be the same in 1800, 1900,  or 2018, but rather was seen as a principle transcending  the recognized rights of that day and age. Otherwise it would violate the very essential theory of justice it purports to uphold.

In that respect, Chief Justice William  Rehnquist set forth in an essay that:

> The framers of the Constitution wisely spoke in general (common) language and left to succeeding generations the task of applying that language to the endlessly changing environment in which they would live". Those who framed, adopted, and ratified the Civil War Amendments Thirteenth to the Constitution likewise used what has been aptly described as "majestic generalities" of in composing the Fourteenth Amendment. Merely because a particular activity may not have existed when the Constitution was adopted, or because the framers could not have conceived of a particular method of transacting affairs, cannot mean that general language in the Constitution may not be applied to such a course of conduct. Where the framers of the Constitution have used general language, they have given latitude to those who would later interpret the instrument to make that language applicable to cases that the framers might not have foreseen. Rehnquist, The Notion of a Living Constitution 29 Harvard Journal of Law and Public Policy 401, at 402.

In 1865, that  Thirteenth Amendment to the U.S. Constitution referred to by Rehnquist was

ratified and finally put an end to slavery. Subsequently, the Fourteenth Amendment (1868) strengthened the legal rights of newly freed slaves by stating, among other things, that no state shall deprive anyone of either "due process of law" or of the "equal protection of the law."

Much later, on December 10, 1948, the General Assembly of the United Nations adopted and proclaimed the Universal Declaration of Human Rights (UDHR) which was co-signed by the United States. Article 2 of the UDHR reads as follows:

> Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, color, sex, language, religion, political or another opinion, national or social origin, property, birth or another status. **Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.** Emphasis added.

Subsequently, in 1992 the International Covenant on Civil and Political Rights (ICCPR), which establishes universal standards for the protection of basic civil and political liberties, as one of three documents that comprise the "International Bill of Rights", was ratified by the United States. Upon ratification, the ICCPR became the "supreme law of the land" under the Supremacy Clause of the U.S. Constitution, which gives such treaties the status of federal law. Accordingly, the U.S. must comply with and implement the provisions of the treaties referred to herein, just as it would any other domestic law.

In 1954, the Supreme Court of the United States decided the case of <u>Bolling v. Sharpe</u> , 347 U.S. 497, which was a companion case to <u>Brown v. Board of Education</u>, supra. In that case the Supreme Court determined that the schools of the District of Columbia were to be desegregated even though Washington D.C. was not a "state". The Court decided unanimously that while the 14th amendment, whose equal Protection Clause was cited in <u>Brown v. Board of Education</u>, supra, in

28

order to declare segregation unconstitutional, did not apply in the District of Columbia because it was not a "state", it did apply within the scope of Fifth Amendment. While the 5th Amendment which was applicable in D.C. lacked an equal protection clause, "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive." Although equal protection is a more explicit safeguard against discrimination, the Court stated that "discrimination may be so unjustifiable as to be violative of due process." Bolling, supra, at 499.

The U.S. citizenship of Puerto Ricans has a gap of equality which represents ambivalence, historically parallel and comparable to the incongruity of the "separate but equal" doctrine, which urged and required the schools to be desegregated by mandate of the U.S. Supreme Court in Brown v. Board of Education, supra. By such similarity, Puerto Ricans in Puerto Rico, after 118 years of U. S. sovereignty, may de facto be considered U.S. citizens subject to an "unincorporated territory limitation but equal", under the law, which essentially is a mutated and camouflaged version of the Plessy v. Fergusson, supra, "separate but equal" discrimination; which still has not been de facto totally eradicated.

The "separate but equal" doctrine was unequal because separate cannot be equal, as determined by Brown v. Board of Education; consequently, the "unincorporated territory limitation but equal" equation of the Puerto Rican U.S. citizenship in Puerto Rico must be equally unequal because conditioning equality to a territorial exclusion cannot be "equal" as well, for approximately 3.5 million Puerto Ricans living in Puerto Rico. In other words, being a U. S. citizen cannot sometimes be different as to constitute a second class citizenship by reason of the territory where you are located or reside. Puerto Ricans are equal U. S. citizens anywhere or they are not. The rest is a flagrant aberration of the fundamental right to democratic participation, justice, and equality under

29

the law. Referring to Puerto Ricans as "equal citizens" but treating them differently by curtailing their rights when residing in their birth land or the birth land of their parents and grandparents, Puerto Rico  is, to say the least, an undignified  contradiction and an unjustified territorial stigmatization. Such differential treatment constitutes a suspect classification that does not even withstand the lesser of the constitutional levels of scrutiny. Notwithstanding the controversial legal precedent in Hirabayashi v. United States, 320 U.S. 81 (1943) and Korematsu v. United States, 323 U.S. 214 (1944) requiring the strict scrutiny in cases involving a suspect classification by reason of national origin and fundamental rights, the decisions in the Insular Cases and its progeny continue using the minimum rational level of constitutional scrutiny. There is no legitimate excuse or  reason for that.

Puerto Rico has been subject to such inequality, violation of due process,  and the violation of  the right to fully exercise  the democratic principles set forth above for more than a century. Such violation is accentuated by the recent March 29, 2018 letter submitted by US Congressman Rob Bishop, Chairman of the Committee of Natural Resources of the House of Representatives, to the members of the Board in which despite the gentle effort to set forth his views regarding the state of affairs in Puerto Rico between the FOMB and the Government of Puerto Rico, he shows the imperialistic perspective of the USA toward Puerto Rico. That attitude is emphasized by his reference to the fact that the legal basis of the Congressional muscle over Puerto Rico is in fact the power to "make all needful rules and regulations for territories" in reference to Article  IV, Section 3,  clause 2 of Constitution of the United States, known as the property or territorial clause of the Constitution of the USA.   Such state of affairs is not conducive to an enjoyment of the right to life, liberty,  and the pursuit of happiness. The Plaintiffs and the People of Puerto Rico do not deserve

such living. In fact, no ethnic group, people, or nation in the world should be subject to such life. Justice demands a reversal of such treatment, in particular if the principles set forth in the Declaration of Independence of the USA, its Constitution, and the international treaties to which the USA is a party are going to have any meaning.

### V.  SOCIOECONOMIC CONTEXT IN WHICH PROMESA  IS BEING APPLIED

Presently, according to the Government of  Puerto Rico and the FOMB, the People of  Puerto Rico is bound to pay  approximately $74 billion  and more than $53 billion in unfunded pensions, without accounting for interests and thousands of claims from citizens  and businesses in a series of labor, tort, civil rights, and contractual claims.  The debt is on top of Puerto Rico´s government in the context of an ongoing economic crisis that has kept the social, financial, commercial,  and daily life of the people in a downward spiral since 2006, that after hurricanes Irma and María have aggravated the already compromised  quality of life of the people, showing no end to that drama in the short, mid,  or far sight.  Moreover, many thousands of well meaning  Puerto Ricans, ready, willing,  and able to contribute socioeconomically to their country, have migrated in greater numbers than before the two major storms.  If the toll on Puerto Rico´s natural resources and economy  was enormous,  after September 20, 2017, the toll on Puerto Rico´s human resources may result to be greater.

The present economic circumstances and the application of the PROMESA Act to Puerto Rico must be considered in light of the reality under which the people of Puerto Rico have been in their relation with the USA.  That relationship has been one based on full control by the USA over Puerto Rico´s economy, insofar as Puerto Rico has not been able to pursue socioeconomic, commercial, and financial policies freely with the rest of the countries of the world, and beyond the

tariff system and  market, commercial,  and financial  economy of the USA.  The control over the

relationship has been to such a degree that over decades the local agricultural, commercial,  and

industrial base of Puerto Rico has been displaced by businesses from the USA.  The displacement

has taken place as  the economic growth and development of Puerto Rico has mainly relied on

providing tax incentives to US companies  to establish factories to provide jobs as part of industrial

production for exports, as long as those incentives are available or there are no better attractive

business conditions elsewhere. Those incentives  became more attractive when Congress adopted

a provision in the US Tax Code pursuant to which Puerto Rico became a greater tax haven for US

companies in the 1970´s.  The section of the Code was known as section 936.  That "growth and

development"  has also been based on the input of federal funds, input that has made Puerto Rico

over time an increasingly  dependent society on the federal government of the USA, without any

possibility of pursuing its own growth and sustainable development.  The structure of such model,

has provided an artificial cash flow for Puerto Rico´s economy falsely perceived as "economic

growth". Such "growth" has also been tarnished by the way  Congress manipulates the incentives

at its whim without any participation by the People of Puerto Rico. Worse of all, since the industrial

base of Puerto Rico has been one designed  toward production for export, while much more than half

of  what the Island needs as far as goods and food is concerned is imported, as the cash flows in, it

goes back to exporters, mainly from the USA.  Moreover, as a result of the fact that as part of the

kind of development that Puerto Rico underwent over time most of the goods and food needed by

consumers have ended being imported from the USA, more and more of the funds submitted by the

federal government to Puerto Rico ends being used to purchase goods and food imported from the

USA, having a menial impact on the socioeconomic growth and development of Puerto Rico.  The

lack of economic and political powers of Puerto Rico to alter or at least exercise some control over that equation, has hampered the possibility of Puerto Rico ever achieving not only the right to self government that the peoples of the world are entitled to, but the level of sustainable growth and development that any society has a right to wish  and achieve.

When Congress decided to eliminate the section 936 tax incentives in 1996 over a ten year phase out period, and while the globalization of the world´s economy began to provide businesses all over the world, including US companies, market and locations to produce goods at lower costs during the 1990´s, Puerto Rico also began to be seen as a less attractive alternative to invest to manufacture products.  Without a sufficiently developed local industrial base, the departure of companies that no longer saw Puerto Rico as an alternative to invest and produce jobs due to the loss of the section 936 benefits and the new global alternatives began the steady decline of Puerto Rico´s economy.  In the meantime the Government of Puerto Rico continued its growth in size and public services, growth that began in  the 1970's without any regard to the short and long time effects  the elimination of section 936 and the globalization of the economy were going to have on the People of Puerto Rico.  Those circumstances reached a point that by 2001 the expenses of the Government of Puerto Rico  began to increase disproportionately with revenues beginning a stream  chronic deficit spending year after year, with the pursuit of debt practices thereafter to engage in questionable government projects and to cover the costs of the government in cahoots with financial entities that formed part of the bond issues having known or disregarding the fact that eventually the government was going to default in the payment of the debt.  All of those practices carried the government to the fiscal crisis in which it is at the present time,  while the different governors that Puerto Rico has had since 2001 and their respective political parties have focused on competing every four years for the

33

control of the government budget and greater and greater reliance on the influx of federal funds into Puerto Rico.[9]  Meanwhile, the governments  have disregarded  the socioeconomic and political circumstances to which Puerto Rico has been subject for decades, the lack of economic and political powers to exercise control over its economy and policies, and the changes in the world economy.

As far as the existing financial crisis Paul Krugman, winner of the 2008  Nobel Prize in Economics in 2008  has indicated that:

> Puerto Rico faces some risk of a death spiral in which the emigration of working - age residents undermines the tax base for those who are left, and deteriorating public services then lead to even more emigration. What this tells us, in turn, is that even for a part of the United States, too much austerity can be self - defeating. It would, in particular, be a terrible idea to give the hedge funds that have scooped up much of Puerto Rico's debt what they want — basically to destroy the island's education system in the name of fiscal responsibility. (Krugman Paul, America's Un-Greek Tragedies. New York Times, August 3, 2015, pp. A19.)

Meanwhile, another Nobel Prize winner in Economics, Joseph Stiglitz (2001)  criticized the first Fiscal Plan approved by the FOMB  indicating that its "draconian" austerity measures are the worst he has ever seen and could plunge Puerto Rico into an even deeper depression  erroneously putting  creditors first causing enormous  amounts of distress. In the article entitled *From Bad to Worse for Puerto Rico,* written by him and Martín Guzmán, they both remarked among  several points the following:   (1) Private-sector jobs are being lost in Puerto Rico.  Total employment in Puerto Rico has fallen from 1.25 million in the last quarter of the 2007 fiscal year to less than a million almost a decade later;  (2) Without employment, large numbers of Puerto Ricans (who are U.S. citizens) migrate to the mainland US.  Without job  prospects, the labor participation rate has

---

[9]It is important to note in that respect that all of the governors of Puerto Rico since the 1997-2000 term decided not to run for reelection or were defeated in their attempts to be reelected.

plummeted to 40%, two-thirds of the level on the US mainland and about 60% of Puerto Rico's

children live in poverty; (3)   Puerto Rico´s debt position is clearly unsustainable, and its economy

will be able to recover only if it gets a fresh start; (4) PROMESA is bringing more problems than

solutions. Recently, the Board—seemingly lacking both any understanding of basic economics and

democratic accountability to provide checks against its incompetence – published its demands for

the next fiscal year. The Board actually predicted that its proposals would turn Puerto Rico's

recession into a depression of a magnitude seldom seen anywhere: a 16.2% decline in GNP in the

next fiscal year (and a further decline the year after); (5) Remarkably, the Board's plan is sketchy

when it comes to its central obligation: crafting a plan for debt restructuring. This is shortsighted

because depressing the economy further will fuel a debt spiral; (6)  But Puerto Rico's problem is a

lack of capacity to pay, not a lack of willingness. The only way confidence  can be  stimulated is by

restoring economic growth; (7) The Board is confusing efficiency with austerity. And while it would

be nice if one could magically bring about productivity increases, the island's real problems call not

so much for supply-side reforms as for increased demand. Puerto Rico is in a demand-constrained

regime, demonstrated by the significant sub utilization of its factors of production; (8) A

commitment to restoring economic growth should be the center of any restructuring proposal – or

of any viable fiscal plan. That commitment must begin with a substantial debt write-off, as well as

a short-term moratorium on all debt payments; and (9) The PROMESA Board was supposed to chart

a path to recovery; its plan makes a recovery  virtually impossible. If the Board's plan is adopted,

Puerto Rico's people will experience untold suffering. And to what end? The crisis will not be

resolved. On the contrary, the debt position will become even more unsustainable".[10] The recent

demands of the Board through letters submitted to the Governor of Puerto Rico on March 28, 2018

rejecting the fiscal plans submitted by the government of Puerto Rico (general government, PREPA

and PRASA) continue to follow that downward path.

The socioeconomic context set forth herein cannot be disregarded.  It must be considered

while the constitutional and legal claims set forth in this Adversary Complaint are addressed.

Moreover, all the aforementioned, the Government of Puerto Rico and the FOMB have continued

with ultra vires expenditures and contracts grossly disregarding the bankrupt economy and the

precarious socioeconomic circumstances of life of the majority of the residents of Puerto Rico.  For

instance, the FOMB hired Natalie Jaresko as Executive Director of the Board at a yearly salary of

$650,000.00 and Noel Zamot as the Revitalization Coordinator at a yearly salary of $325,000.00, as

if the Board was at the top of the Fortune 500 companies. That is unconscionable and immoral.

Meanwhile, the Government of Puerto Rico has hired three nonresidents of Puerto Rico, as if there

was no one competent enough in  Puerto Rico at salaries way above the salary of any of the

secretaries of the Cabinet of the President of the United States. Julia Keleher was hired as Secretary

of Education at a salary of $250,000.00 per year; Héctor Pesquera as Security Chief of Puerto Rico

at a salary of $248,500.00 per year; Walter Higgins III as Executive Director of PREPA at a

$450,000.00 salary plus incentives; and Brad Dean as the top executive official  of Puerto Rico´s

DMO, the new entity created to promote tourism in Puerto Rico at a yearly rate of $250,000.00 plus

incentives. Those hiring practices have been undertaken in open disregard of the fact that there are

---

[10](Joseph E. Stiglitz & Martin Guzman, From Bad to Worse for Puerto Rico (Feb. 28, 2017),
Project Syndicate, available at https://www.projectsyndicate.org/commentary/puerto-rico-debtplan-
deep-depression-by-joseph-e--stiglitz-and-martin-guzman-2017-02.)

persons in Puerto Rico capable to hold those positions at the prevailing rates by law and or the rates

set forth for PREPA and the Tourism Company executive directors in the past. If we consider that

the yearly salary of the President of the USA is $400,000.00 a year, the Vice President of the USA

$230,700.00;   cabinet secretaries $210,700.00, the Speaker of the House $223,500.00 and the

Director of the FBI $185,000.00, the hiring practices of the Government of Puerto Rico have been

as unconscionable and immoral.  The Plaintiffs and the People of Puerto Rico do not deserve such

conduct that is full of lack of transparency and accountability, in addition to a lack of concern on the

part of the members of the Board and the leadership of the Government of Puerto Rico for the well

being of the People of Puerto Rico. In fact, as their public conduct and their behavior before this

Court reveals, their concern is that of pursuing their particular ideological, personal, and/or partisan

agendas in the context of decision making processes that completely disregard the constitutional,

civil,  and human rights that serve as basis of the claims of the Plaintiffs.  The Plaintiffs and the

People of Puerto Rico do not deserve such treatment.  Justice demands a reversal of such conduct

by the Board and the Government of Puerto Rico.

## VI.  PROMESA AND GENERAL ALLEGATIONS

1.  As a result of an economic recession that began in Puerto Rico on or around the year

2006, and a series of questionable financing and borrowing practices by the government of Puerto

Rico, its financial advisors and commercial banking entities throughout more than twenty years , the

Government of Puerto Rico reached a debt level of $72,000,000,000 on or around the year 2012.

In the meantime and during all of those years the Government of Puerto Rico began confronting

problems in the payment of the public debt because  it could not generate enough revenues  to pay

those and other obligations reaching a position in which it had to default in the payment of its public

debt by the year 2016.

2. The default brought the Government of Puerto Rico and several of its public corporations into a fiscal crisis.

3. As a result of that fiscal crisis Congress adopted the PROMESA Act on June 29, 2016.

4. On June 30, 2016, the President of the USA signed the Puerto Rico Oversight Management and Economic Stability Act (PROMESA) into law becoming Public Law 114-187.[11] Said legislation sets forth that it was approved to tackle the fiscal emergency of Puerto Rico, to promote its sustainable development, and to institute a "comprehensive approach to Puerto Rico's fiscal, management, and structural problems and adjustments... involving independent oversight and a Federal statutory authority for the Government of Puerto Rico including instrumentalities, in managing its public finances, and for other purposes to restructure debts in a fair and orderly process."

5. The statute provides for the establishment of an Oversight Board (FOMB) for Puerto Rico that would have seven (7) members with the purpose of providing a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets.

6. The statute expressly provides that Congress is approving the statute pursuant to Article IV, Section 3, clause 2 of the Constitution of the USA, also known as the territorial clause.

7. The statute further provides in Section 101(c) that the FOMB (1) shall be created as an entity within the territorial government for which it is established in accordance with the law, and stating unequivocally (2) that the FOMB shall not be considered to be a department, agency,

---

[11]On that same date the President signed the Freedom of Information Reform Bill to promote greater transparency in in the federal government, while the PROMESA Act and the conduct of the FOMB has been far from transparent. .

38

establishment, or instrumentality of the Federal Government.  Through that provision Congress
pretends to distance its creature from its source, the federal government.

8. Among other provisions, PROMESA: (i) establishes a process for the FOMB to approve
a fiscal plan governing the Commonwealth's future finances and budgets (Title II); (ii) establishes
a process for the FOMB to file a bankruptcy petition on behalf of the Commonwealth of Puerto Rico
or its instrumentalities (Title III); and (iii) provides for an alternative mechanism for the adjustment
of the Commonwealth's bond debt outside of a bankruptcy proceeding by effectuating modifications
with the substantial, but not necessarily unanimous, support of the affected bondholders.

9. According to section 108 of PROMESA neither the Governor nor the Legislature of
Puerto Rico  may (1) exercise any control, supervision, oversight, or review over the Oversight
Board or its activities; or (2) enact, implement, or enforce any statute, resolution, policy, or rule that
would impair or defeat the purposes of PROMESA  as determined by the FOMB.  Moreover, section
106(e) of the statute provides, as if the members of the FOMB were infallible,  that there shall be no
jurisdiction in any United States district court to review challenges to the Oversight Board's
certification determinations under the Act.[12]

10. Pursuant to PROMESA, the government of the  Commonwealth of Puerto Rico , in
conjunction with and under the supervision of the FOMB, must develop a fiscal plan designed to
"provide a method to achieve fiscal responsibility and access to the capital markets".  PROMESA
§201(b)(1), (2).

---

[12]Such bar to any challenge in that respect is unconstitutional inasmuch as it violates the due
process clause of the Fifth Amendment of the Constitution of the USA, and it also violates the First
Amendment of the Constitution of the USA in as much as it deprives the right of the Plaintiffs and
the People of Puerto Rico to judicial review through the exercise of the right to petition the redress
of grievances.

11.   Congress included a series of requirements that any fiscal plan adopted for the Government of Puerto Rico must satisfy.  PROMESA §201(b) authorized the FOMB to certify the fiscal plans only if the fiscal plan satisfies such requirements. Id. §201(c)(3)(A).

12.  PROMESA in Section 201(b)(1)(A), (B), (G), (J) specifically provides among other requirements and in its pertinent parts that any fiscal plan must:

> i.      Provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on -
> (i) applicable laws; or
>
> (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;
>
> ii.     ensure the funding of **essential public services** ;
> [...]
>
> (G)     enable the achievement of fiscal targets;
> [...]
>
> (J)     provide for capital expenditures and investments necessary **to promote economic growth**[13];
>
> [...]  Emphasis added.

13.  The FOMB has the responsibility pursuant to section 203(a) and (b) to certify a fiscal plan for the Government of Puerto Rico that will,  among other matters,  ensure the funding of essential public services and provide adequate funding for public pension systems.  See Section 203(b)(1)(b) and (c).  The Plaintiffs reiterate that as of the date of this Adversary Complaint neither the FOMB nor the Government of Puerto Rico have defined which and what are the "essential services".

---

[13]As of the date of this Adversary Complaint the FOMB and the Government of Puerto Rico have failed to define what those essential public services are.

14.  According to PROMESA, the FOMB in its sole discretion may designate any territorial instrumentality as a covered entity by the Act and subject to the requirements of  PROMESA.  It may also require the Governor to submit to the government budgets and monthly or quarterly reports regarding a covered territorial instrumentality and may designate any covered territorial instrumentality to be included in the Territory (Puerto Rico) Government Budget.  It can also require other separate instrumentality budgets even  when those budgets do not require legislative approval in Puerto Rico. The same principle also applies to the fiscal plans of the above mentioned instrumentalities and the FOMB may also decide which instrumentalities are excluded from the application  provisions of PROMESA provisions.  See section 101(d) of the statute.

15.  According to the statute, the  members of the FOMB shall be appointed by the President of the USA.

16.  The members of the FOMB must not have  any conflict of personal financial interests and must submit personal financial statements.  See section 109 of the statute.  See also Caperton, et al., v.  A.T. Massey  Coal  CO. INC. 556 U.S. 868,  129 S.Ct. 2252 (2009).

17. According to PROMESA Section 104 (48 U.S.C. §2124) , the FOMB has the power and authority to hold hearings and sessions, obtain official data from Federal and territorial governments, obtain creditor´s  information, issue subpoenas, enter into contracts, enforce certain laws of the covered territory, recur to judicial civil actions to enforce its authority, and conduct investigations. The FOMB has also the power to amend and/or make changes to the budget of the Government of Puerto Rico and its agencies, to  require the adoption of legislation and to annul laws, rules and/or regulations adopted by the government of Puerto Rico to the extent it believes they are contrary to its fiscal and budgetary plans.  As of the date of this complaintm the  FOMB  has actually made use

of such prerogatives and authority under PROMESA and has flexed its muscles in that respect in its communications with the Goverment of Puerto Rico.

18. According to the statute, if a fiscal plan does not satisfy the requirements of PROMESA, then the "Board shall provide to the Governor a notice of violation." Id. §201(c)(3)(B).

19. Once a fiscal plan is certified by the FOMB, the Commonwealth is required to approve annual budgets that follow the certified fiscal plan. See PROMESA §202.

20. PROMESA provides a  process to restructure the payment of the public debt of Puerto Rico through negotiation and/or the reorganization of the fiscal affairs of Puerto Rico as part of a bankruptcy process adopting some provisions of the Bankruptcy Act of the USA.  As part of the process the FOMB has among other powers the power to:

a.      Set the financial, legislative, public administration,  and budgetary agenda and policies of the government of Puerto Rico;

b.      Make recommendations  as to the fiscal plan that the government of Puerto Rico will adopt and to the extent the Government of Puerto Rico does not follow those recommendations and/or reach an agreement with the FOMB in that respect, the Board has the power to enforce a fiscal plan (see section 201(d)(2) and 201(e)(2) of the statute;

c.      Make recommendations as to the budget that the government of Puerto Rico will adopt  and to the extent the Government of Puerto Rico does not follow those recommendations and/or reach an agreement with the FOMB in that respect, the Board has the power to enforce the adoption of a budget compliant with the fiscal plan (see section 202(c)(2) and section 202(d)(2) of the statute);

42

d.      Review and reject  the approval of laws adopted by the legislature of Puerto Rico that do not comply with PROMESA or the  the Board's policies, plans, and agenda (see section 204(5) of the statute);

e.      Review and reject  the rules and regulations adopted by the Government  of Puerto Rico that do not comply with PROMESA or the  the Board's policies, plans, and agenda (see section 204(b)(4) of the statute);

f.      Authority to review  contracts adopted by the government (see section 204(b)(2) of the statute); and

g.      Enforce through the corresponding court actions, the  determinations of the Board that the government of Puerto Rico through any of its branches refuses to comply with (see section 104(k) of the statute.

21. On the basis of such powers, the determinations of the FOMB have a direct and indirect effect over the residents of Puerto Rico, including government employees, bond holders, members of credit unions, retired government employees, shop owners, public school students, labor unions, etc.  Those decisions also  have a direct or indirect impact over the salaries, property, and essential services of the residents of Puerto Rico,  and  over existing contractual rights and entitlements; existing statutory and constitutional rights of the residents and citizens of Puerto Rico.  In that respect  property and liberty rights of the residents and citizens  of Puerto Rico are affected.

22. The members of the Board are appointed by the President of the United States through a process set forth by the statute,  and adding insult to injury and as part of the due process of law violations by the USA over the People and residents of Puerto Rico, as part of the statute the US Congress imposed  all of the costs and expenses of the Board on the government of Puerto Rico and

accordingly by Puerto Rico´s tax payers. Such imposition betrays the core principles on which the USA is supposed to stand as set forth in its Declaration of Independence and the Bill of Rights of its Constitution, and in particular the essence of the due process of law.

23. The inhabitants of Puerto Rico do not have any participation in the selection of the members of the Board nor in its decision making process.

24. The FOMB, its members, and its employees are not liable for any obligations of or claims against the FOMB or its members or employees or the territorial government resulting from actions taken to carry out PROMESA. See section 105 of the Act.

25. Furthermore, as set forth before neither the Governor nor the Legislature may-- (1) exercise any control, supervision, oversight, or review over the FOMB or its activities; or (2) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of the PROMESA Act, as determined by the FOMB. See section 108(a).

26. The Act provides that if the FOMB determines that the Governor, in the case of any then applicable certified Instrumentality, Budgets, and the Governor and the Legislature, in the case of the then-applicable certified Territory Budget, have failed to correct an inconsistency identified by the FOMB, the FOMB shall-- (1) with respect to the territorial government, make appropriate reductions in non debt expenditures to ensure that the actual quarterly revenues and expenditures for the territorial government are in compliance with the applicable certified Territory Budget or, in the case of the fiscal year in which the FOMB is established, the budget adopted by the Governor and the Legislature; and (2) with respect to covered territorial instrumentalities at the sole discretion of the FOMB-- (A) make reductions in non debt expenditures to ensure that the actual quarterly revenues and expenses for the covered territorial instrumentality are in compliance with the

applicable certified Budget or, in the case of the fiscal year in which the FOMB is established, the budget adopted by the Governor and the Legislature or the covered territorial instrumentality, as applicable; or (B)(i) institute automatic hiring freezes at the covered territorial instrumentality; and (ii) prohibit the covered territorial instrumentality from entering into any contract or engaging in any financial or other transactions, unless the contract or transaction was previously approved by the FOMB.  See section 203 (d).

27.   In addition to the powers set forth above, the Act provides that if the territorial government fails to comply with a direction given by the FOMB  with respect to a law, the FOMB may take such actions as it considers necessary, consistent with this Act, to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law.  See section 204(a)(5) of the Act.

28.  The FOMB also has the power to  establish policies to require prior FOMB approval of certain contracts, including leases and contracts to a governmental  entity or government-owned corporations rather than private  enterprises that are proposed to be executed by the territorial government, to ensure such proposed contracts promote market  competition and are not inconsistent with the approved Fiscal Plan.  See section 204(b)(2).

29.  As far as the power over laws of Puerto Rico the FOMB has the power to review, and in its sole discretion, rescind, any law that-- (i) was enacted during the period between, with respect to Puerto Rico, May 4, 2016; or with respect to any other territory, 45 days prior to the establishment of the FOMB for such territory, and the date of appointment of all members and the Chair of the FOMB.  See section 204(c)(B).

30.  Furthermore the FOMB may at any time submit recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the territorial government, including recommendations.  See section 205(a).

31.  As far as debt issuance, for so long as the FOMB remains in operation, the Government of Puerto Rico may not, without the prior approval of the FOMB, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt.  See section 207.

32.  Pursuant to the Act  a voluntary case under PROMESA is commenced by the filing with the district court of a petition by the FOMB.  See section 304.  Moreover, in such cases the FOMB in a case under PROMESA **is the representative of the debtor, in this case the Government of Puerto Rico.** See section 315(b).  Emphasis added.

33.  The FOMB has interpreted the statute and exercised its authority  as if it has  such powers without any oversight or the  consent by the Government of Puerto Rico, the Puerto Rico Legislature or any Puerto Rico Government entity, or by the people of Puerto Rico.  In the exercise of such authority  there has been  no direct or indirect input on the part of the voters from Puerto Rico, or its elected officials in the manner and matter pursuant to which the FOMB ultimately makes decisions over the budget of the Government of Puerto Rico, the policies of the Government of Puerto Rico, its essential services and its laws and regulations, notwithstanding what this  Court has determined as far as the extent of the power of the FOMB as far as the Government of Puerto Rico

46

is concerned. In that respect see Opinion and Order dated November 16, 2017, Docket 471 in case number 17-04780.

34.  The FOMB, is  such a broad and powerful entity, that it has the authority and power to make decisions over the People and residents of Puerto Rico, without any accountability to the People of Puerto Rico, and without any oversight, screening and participation by the People of Puerto Rico and/or its elected representatives.

35.  As an example of the exercise of such broad powers over the government of Puerto Rico and its elected officials the FOMB has undertaken among others the following actions:

a)   On October 14, 2016, then-Governor  of Puerto Rico Alejandro García Padilla submitted to the FOMB the first proposed Fiscal Plan for the Commonwealth (the "García Padilla Plan"). The García Padilla Plan was rejected by the FOMB at its meeting on November 18, 2016.   At that meeting, the FOMB adopted and communicated publically a set of five principles for the Fiscal Plan.

b)   Governor Rosselló submitted his first Revised Fiscal Plan - a revision of the García Padilla Plan - to the FOMB on February 28, 2017 (the "February 28 Plan).  The February 28 Plan proposed no funding for public pension systems per se, but instead provided for a "pay-as-you-go model to cover remaining defined benefit obligations" from the Commonwealth' general budget. On March 9, 2017, the FOMB, sent the Governor a letter stating that the February 28 Plan did not "comply with the requirements set forth in PROMESA".  Despite noting that, in the FOMB's view, the February 28 Plan was "heading in the right direction" in many areas, the Board again insisted-as it had at its November 18, 2016 meeting and its January 18, 2017 letter-on a firm, round and unexplained "10% benchmark" for pension cuts.  The FOMB also stated that it would approve a Fiscal Plan on March 13, 2017.

c)   The Government soon after submitted a revised version of its fiscal plan which was finally approved by the FOMB on March 13, 2017. Despite some resistance from the governor, the plan included furloughs and elimination of other public employee benefits per the FOMB's conditions.

d)   On June 30, 2017, the FOMB unilaterally ordered $13 million in cuts to the state legislature's budget; a capacity not included in PROMESA, per se.

47

e)       On July 22, 2017, the Puerto Rican Legislature approved Senate Bill 404, which reversed certain retirement cuts that had been approved by the García Padilla administration during 2013. Nevertheless, the FOMB sent a letter to the Governor, ordering for the law to be vetoed.

f)       On August 4, 2017, the FOMB imposed a two-day per month furlough on public employees, despite protests from Puerto Rico's government.

g)       On August 31, 2017, the FOMB sent another letter, but now in regards to the recently passed Act 47, which allowed for the Patients Ombudsman to impose penalties on those health insurers that deny medical services to their patients for purely economic reasons. Per the FOMB's request, Rosselló was to provide additional information to support the law, or the FOMB would prevent the law from taking place.

h)       On January 11, 2018, the FOMB rejected Senate Bill 774, which sought to create a fund to support municipal governments in an attempt to respond to post-hurricane emergencies as well as aleviate limited funding on the city-level.  That same day, the FOMB also rejected Senate Bill 43, which created a firearm and drug-free program for the island's schools.

j)       On March 28, 2018 the FOMB rejected the fiscal plans proposed by the Government of Puerto Rico for the government, PREPA, and PRASA submitting letter to the Government of Puerto Rico with recommendations including a series of austerity measures that would adversely affect the Plaintiffs and the People of Puerto Rico.

36.  The power of the FOMB is such that it can and it has abridged constitutional and civil rights of Puerto Rican inhabitants, and it has deprived of statutory and contractual entitlements, and as such, those actions constitute a deprivation and taking of property rights without due process of law. Inasmuch as  the FOMB has the power and it has exercised that power under color of authority on the basis of the terms set forth in the PROMESA Act as enacted by Congress, the creation of the FOMB and the exercise of any power on the basis of that statute is inconsistent with the Declaration of Independence of the USA, the  Constitution of the USA, the United Nations Charter, the Universal Declaration of Human Rights, the International Covenant of Civil and Political Rights and the constitutional,  civil and human  rights of the inhabitants of Puerto Rico.

37.   Article VI, Clause 2 of the Constitution of the USA provides that the Constitution, and the Laws of the United States which shall be made in pursuance thereof; **and all Treaties made**, or which shall be made, under the Authority of the United States, **shall be the Supreme Law of the Land**. Emphasis added.

38.   The United Nations Charter applies to the People of Puerto Rico.  It is part of the Supreme Law of the Land insofar as the USA is part of the Charter and Congress ratified its participation in that Treaty.

39.   The Universal Declaration of Human Rights of the United Nations applies to the People of Puerto Rico.

40.   The USA joined the Universal Declaration of Human Rights of the United Nations on December 10, 1948.

41.   Regardless of whether the Senate of the USA may have ratified or may have not ratified the Universal Declaration of Human Rights, the human rights set forth therein are natural rights not only acknowledged by most of the nations of the world, but they are human rights that human beings morally are entitled to enjoy, rights fought for during centuries and that form part of the right to life, liberty and to pursue happiness.

42.   The USA has joined the International Covenant of Civil and Political Rights.

43.   The International Covenant of Civil and Political Rights applies to the People of Puerto Rico.

44.   Congress ratified the International Covenant of Civil and Political Rights on April 12, 1992.

49

45.   The First Amendment of the Constitution of the USA applies to Puerto Rico and its inhabitants just as the same rights referred to therein in the Universal Declaration of Human Rights of the United Nations and in the International Covenant of Civil and Political Rights.

46.   The Fifth Amendment of the Constitution of the USA applies to Puerto Rico and its inhabitants just as the same rights referred to therein in the Universal Declaration of Human Rights of the United Nations and in the International Covenant of Civil and Political Rights.

47.   The Fourteenth Amendment of the Constitution of the USA applies to Puerto Rico and its inhabitants just as the same rights referred to therein in the Universal Declaration of Human Rights of the United Nations and in the International Covenant of Civil and Political Rights.

## V.  CAUSES OF ACTION:

### A.  FIRST CAUSE OF ACTION: THE UNCONSTITUTIONALITY OF THE FOMB DUE TO THE VIOLATION OF INTERNATIONAL COVENANTS THAT BIND THE USA[14]

a) Introduction:

1.  The Plaintiffs reassert each and every one of the allegations set forth above.

2.  Ever since the adoption of the Foraker Act, the USA has exercised its political and socioeconomic powers over the people of Puerto Rico relying on the powers bestowed on Congress

---

[14] The Plaintiffs are aware of the fact that Section 602 of PROMESA provides that in any judicial proceeding regarding this title, Federal, State, or territorial laws of the United States, as applicable, shall govern and be applied without regard or reference to any law of any international or foreign jurisdiction. However, Congress has no power to disregard, limit, and/or legislate over and above Article VI, clause 2 of the Constitution of the USA that provides that: " This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; **and all Treaties made, or which shall be made, under the Authority of the United States, shall be the Supreme Law of the Land."** Emphasis added.

by Article IV, Section 3, cl. 2 which provides that Congress has the power to dispose of and make all **needful rules and regulations** for the territories of the USA. Emphasis added.

3. There are a series of other historical and legal provisions applicable to this complaint and to this first cause of action that correspond to the Charter of the United Nations, the Declaration of Independence of the United States, the Constitution of the United States, the Declaration of Human Rights of the United Nations, and the International Covenant of Civil and Political Rights.

4. The applicable provisions of those historical and legal sources pertinent to the First Cause of Action are the ones set forth as follows.

b) The United Nations Charter

1. The United Nations Charter is a treaty among nations.

2. By forming part of the nations that agreed to the terms of the United Nations Charter, the United States forms part of the Charter and that is one of the treaties adopted that forms part of the Supreme Law of the USA.

3. By adopting the United Nations Charter in 1945, the USA adopted the principles and purposes to develop friendly relations among nations **based on respect for the principle of equal rights and self-determination of peoples universal respect for and observance of human rights and fundamental freedoms for all** without distinction as to race, sex, language, or religion. Emphasis added.

4. Article 73 of the Charter expressly provides that members of the United Nations which have or assume **responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the interests of the inhabitants of these territories are paramount, and accept as a sacred trust** the obligation to

51

promote to the utmost, within the system of international peace and security established by the present Charter, the **well-being of the inhabitants of these territories**, and, to this end:

> a. to ensure, with due respect for the culture of the peoples concerned, their political, economic, social, and educational advancement, their just treatment, and their protection against abuses;

> b. **to develop self-government, to take due account of the political aspirations of the peoples, and to assist them in the progressive development of their free political institutions**, according to the particular circumstances of each territory and its peoples and their varying stages of advancement;

> c. to further international peace and security;

> d. to promote constructive measures of development, to encourage research, and to co-operate with one another and, when and where appropriate, with specialized international bodies with a view to the practical achievement of the social, economic, and scientific purposes set forth in this Article; and

> e. to transmit regularly to the Secretary-General for information purposes, subject to such limitation as security and constitutional considerations may require, statistical and other information of a technical nature relating to economic, social, and educational conditions in the territories for which they are respectively responsible... (Emphasis added)

5.  By the USA joining the United Nations Charter and committing itself to comply with its terms,   and considering the fact that the People of Puerto Rico have a right to equal rights and the right to self-determination, assuming that prior to 1945 the USA had the authority to assert colonial powers over Puerto Rico pursuant  to Article IV, Section 3, clause 2 of its Constitution, power that the Plaintiffs do not acknowledge inasmuch as it is contrary to the Declaration of Independence of the USA, the USA waived the power to exercise such colonial authority and to adopt any rules and regulations over Puerto Rico on the basis of the terms set forth in Article IV Section 3 clause 2 of the Constitution of the USA.

6.   Furthermore, as a party to the Universal Declaration of Human Rights, the USA committed itself to recognize that **the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world**; that it is essential, if men [and women] are not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that **human rights should be protected by the rule of law**; and  that  the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, **in the dignity and worth of the human person and in the equal rights of men and women** and have determined to promote social progress and better standards of life in larger freedom.  See Preamble of the Universal Declaration.  Emphasis added.

7.   The USA also made a commitment to recognize in that Universal Declaration the following principles and human rights:

a) All human beings are born free and equal in dignity and rights (Article 1);

b) Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty  (Article 2);

c) All are equal before the law and are entitled without any discrimination to equal protection of the law.  (Article 7); and

d)  Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.  (Article 25).

8. As far as the International Covenant of  Civil and Political Rights is concerned, by joining that Covenant the USA made a commitment to recognize that the inherent dignity and  the equal and

inalienable rights of all members of the human family is the foundation of freedom,  justice and

peace in the world; that those rights derive from the inherent dignity of the human person; that, in

accordance with the Universal Declaration of Human Rights, the ideal of free human beings enjoying

civil and political freedom and freedom from fear and want can only be achieved if conditions are

created whereby everyone may enjoy his civil and political rights, as well as his economic, social and

cultural rights; and that the  States under the Charter of the United Nations  have the obligation  to

promote universal respect for, and observance of, human rights and freedoms.  See Preamble of

Covenant.

9.  As part of that Covenant the USA also made a commitment to recognize among other

pertinent obligations that:

> a) All peoples have the right of self-determination. By virtue of that right they freely
> determine their political status and freely pursue their economic, social and cultural
> development;
>
> b) All peoples may, for their own ends, freely dispose of their natural wealth and
> resources without prejudice to any obligations arising out of international economic
> co-operation, based upon the principle of mutual benefit, and international law. In no
> case may a people be deprived of its own means of subsistence; and
>
> c) The States Parties to the present Covenant, **including those having responsibility
> for the administration of Non-Self-Governing and Trust Territories, shall
> promote the realization of the right of self-determination**, and shall respect that
> right, in conformity with the provisions of the Charter of the United Nations.  See
> Article 1of Covenant.  (Emphasis added.)

10.  As part of that Covenant the USA also made a commitment to recognize among other

pertinent obligations that it will respect and  ensure to all individuals within its territory and subject

to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such

as race, colour, sex, language, religion, political or other opinion, national or social origin, property,

birth or other status.  Furthermore the USA made a commitment to  take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant.  See Article  2.1 and 2.2 of the Covenant.

11. As part of that Covenant the USA also made a commitment to recognize among other pertinent obligations: (a) to ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity; (b) to ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy; (c) to ensure that the competent authorities shall enforce such remedies when granted.  See Article 2.3 of the Covenant.

12. As part of that Covenant the USA also made a commitment to recognize among other pertinent obligations that every citizen shall have the right and the opportunity, without any of the distinctions mentioned in article 2 and without unreasonable restrictions: (a) to take part in the conduct of public affairs, directly or through freely chosen representatives; (b) to vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors; and (c) to have access, on general terms of equality, to public service in his country.  See Article 25 of the Covenant.

13.  Finally, as part of that Covenant the USA also made a commitment to recognize among other pertinent obligations that all persons are equal before the law and are entitled without any discrimination to the equal protection of the law and that  the law shall prohibit any discrimination

55

and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.  See  Article 26 of the Covenant.

14. All of the governments of Puerto Rico since the year 1949  wrongfully, negligently and/or in complicity with the government of the USA have failed to challenge the colonial regime that the USA has established in Puerto Rico since 1898, and to demand  the USA to comply  with the obligations set forth in the treatises set forth above. They have done so  despite the moral, ethical, legal, socioeconomic, political, and philosophical principles and human rights acknowledged by the nations of the world therein and the fiduciary duty they had to respect and promote those principles and rights. .

15. Regardless of how wrongful, negligent,  and/or complicit with the USA  all of the governments of Puerto Rico have been in the disregard of the obligation to  protect and safeguard the well being and human rights of the People of Puerto Rico, and to challenge  the violation by the USA of  the self-determination, moral, civil, constitutional, and human rights of the inhabitants of Puerto Rico as individuals and as a People, as set forth in the treatises set forth above, allowing the illegal and unfettered exercise of power by the government of the USA over Puerto Rico, by imposing on the Plaintiffs and the  People of Puerto Rico the FOMB with the powers set forth in PROMESA, Congress and the FOMB deprive the People of Puerto Rico and the Plaintiffs of their right to self determination and the rights set forth in the treatises referred to above.

16.  Inasmuch as the PROMESA Act was adopted as set forth by the statute on the basis of Article IV Section 3 clause 2 of the Constitution of the USA, and inasmuch as the powers over Puerto Rico under that clause of the Constitution of the USA were waived by the government of the

USA by joining the United Nations Charter in 1945, and the other treaties set forth above, the creation of the FOMB and its imposition over Puerto Rico by Congress is null and void and accordingly should be declared unconstitutional, just as any and all acts undertaken by the FOMB, and the proceedings under PROMESA should be stayed.

17.   Inasmuch as by approving the PROMESA Act Congress has violated the obligations of the USA set forth above under the United Nations Charter and the treaties referred to above, the Plaintiffs have been deprived by such legislative action of their right to due process, to the equal protection of the laws, and to self determination. Thus, the creation of the FOMB should be declared unconstitutional, and the implementation of any and all fiscal plans approved by the FOMB, just as any of its act should be declared null and void, and the proceedings under PROMESA should be stayed.

18.   Accordingly, it is respectfully requested from the Court to declare so through the corresponding judgment, and to order the members of the Board, the Board itself and all of its employees and contractors to return to the Government of Puerto Rico any and all monies paid by the government of Puerto Rico pursuant to the terms of the PROMESA Act, and to order the Government of the USA to account for and pay to the Government of Puerto Rico any sums of money used by the FOMB and its employees and its contractors that are not returned inasmuch as it must respond for the enactment and imposition over the Plaintiffs and the People of Puerto Rico of an illegal and unconstitutional act

## B.   SECOND CAUSE OF ACTION: THE UNCONSTITUTIONALITY OF THE FOMB AS A VIOLATION OF THE DECLARATION OF INDEPENDENCE AND THE CONSTITUTION OF THE USA

1. The Plaintiffs reassert each and every one of the allegations set forth above.

2.  Congress enacted the PROMESA Act wrongfully and/or rightfully pursuant to Article IV, section 3 of the Constitution of the United States, which provides Congress the power to dispose of and make all **needful rules and regulations** for the territories of the United States including Puerto Rico. Emphasis added.

3.  The power to enact rules and regulations by Congress under Article IV Section 3 of the Constitution of the USA is not unrestricted inasmuch as Congress must adopt rules and regulations for the territories that are **needful**, and as part of the exercise of that power, it must comply with the terms of that Constitution and with certain fundamental constitutional, civil, and natural rights that the inhabitants of the territories have just as the inhabitants of any of the states of the USA.

4.  The Declaration of Independence of the United States is the document pursuant to which the United States of America arose and were born as a nation in the world. In fact, it is the birth certificate of the USA.

5.  The text and spirit of the Declaration of Independence of the USA form part of the legal basis of the Constitution of the USA.

6.  The Declaration of Independence sets forth the moral, socioeconomic, political and philosophical foundations of the USA, and accordingly, that declaration is the primary foundational and legal document of the USA.

7. As set forth before, the Declaration provides that:

> "**We hold these truths to be self evident, that all men [and women] are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty, and the pursuit of Happiness. That to secure these rights, governments are instituted among men [and women], deriving their just powers from the consent of the governed**; that whenever any form of government becomes destructive of those ends, it is the Right of the people to alter or to abolish it; and to institute new

58

government, laying its foundations on such principles, and organizing
its powers in such form, as to them shall seem most likely to effect
their safety and happiness". Emphasis added.

8.   On the other hand, the inhabitants  of Puerto Rico are entitled to the fundamental

constitutional rights set forth in the Bill of Rights of the Constitution of the United States, and in

particular  to the rights set forth in the First,  Fifth, and  Fourteenth Amendment of the Constitution

of the United States. In that respect   see Posadas de Puerto Rico Associates v. Tourism Company

of Puerto Rico, 478 U.S. 328 (1986) (applying the First Amendment);and  see also Examining Board

v. Flores de Otero  426 U.S. 572 (1976) (applying the Fifth Amendment to Puerto Rico just as the

equal protection rights). In Examining Board supra,  the Supreme Court set forth that  Congress

explicitly provided that  "The Constitution and all laws of the United States which are not locally

inapplicable shall have the same force and effect within all the organized Territories, and in every

Territory hereafter organized as elsewhere within the United States." Rev. Stat. § 1891 (1874)."

9.   One of the fundamental rights that the Plaintiffs and the  People of Puerto Rico have as

inhabitants of the territory of Puerto Rico and as citizens of the USA is the right to free speech set

forth in the First Amendment of the Bill of Rights.  That Amendment sets forth in its pertinent part

that:

Congress  shall make no law ....,  **prohibiting the free exercise thereof; or abridging the
freedom of speech**, or of the press; **or the right of the people peaceably to assemble**, and
to petition the government for a redress of grievances.  Emphasis added.

6. The rights set forth in the First Amendment intrinsically include the right to vote.

7. On the other hand, the Fifth  Amendment of the Constitution of the USA  provides in its

pertinent part that no  person shall be deprived of life, liberty, or property  without due process of

law.  It also guarantees the right of persons in the USA,  including the People of Puerto Rico,  to the

equal protection of the laws, just as the Fourteenth Amendment of the Constitution of the United States.[15]

8. As set forth before, the FOMB created by Congress through the PROMESA Act has  the power as part of its oversight authority to reject statutes adopted by the legislative assembly of Puerto Rico, to require changes in the statutes, to reject the budgets  approved by the legislative assembly of Puerto Rico and the fiscal plans adopted by the government of Puerto Rico, and to establish and impose budgets and fiscal plans on the government of Puerto Rico to the extent no agreement is reached between the Government of Puerto Rico in the FOMB  in  that respect.

9.  Since the year 1900, the People of Puerto Rico have exercised the right to vote for representatives at the municipal and legislative level to exercise the power to manage their townships and to adopt those statutes and budgets that they may deem convenient and favorable to them. The legislative level pertained to a house of representatives inasmuch as the upper chamber members were the individuals named to form part of the governors cabinet, who were not elected by the People of Puerto Rico.

10.  Since 1917, the People of Puerto Rico were allowed to vote for the members of the upper chamber of the Puerto Rico legislative assembly.

11. Since 1948 the People of Puerto Rico have exercised the right to vote  for  the top executive officer of the government of Puerto Rico, the governor,  and since the year 1952 within the terms of a constitution with a republican form of government and a bill of rights, all of them political

---

[15]The Fourteenth Amendment is also included as part of Plaintiffs claims to the extent the Court determines as PROMESA sets forth that the FOMB is a territorial and not a federal entity.

prerogatives executed as part of acts of Congress pursuant to its powers under the Constitution of the United States.

12.   Ever since the USA invaded Puerto Rico asserting absolute  military, socioeconomic, and political power over Puerto Rico and its inhabitants, the USA has failed to comply with the obligation to respect the  legal basis of its republican democracy, and that is to allow the People of Puerto Rico to institute their own government among the nations of the world, just as the USA did from July 4, 1776, deriving their just powers from the consent of the inhabitants to secure the right of the People of Puerto Rico   to life, liberty,  and the pursuit of happiness, as they deem best.

13. By enacting PROMESA,  Congress recognized  the fiscal  crisis in the Commonwealth of Puerto Rico and its instrumentalities, and recognized   the fiscal emergency that renders the government of the Commonwealth of Puerto Rico unable to provide its citizens effective services, while suffering the migration of residents and closing of businesses.  Congress, however, in violation of its  constitutional and legal obligations enacted  PROMESA with powers to impose decisions and policies  over the People of Puerto Rico that may and have deprived the inhabitants of Puerto Rico of their quality of life, and accordingly liberty and property  rights,  without due process of law and without the representative and democratic participation of the People of Puerto Rico, and without acknowledging the colonial relationship that has endured Puerto Rico since 1898.

14. The powers bestowed upon the FOMB by Congress, as exercised and as can be continued to be exercised by the FOMB, have deprived the liberty, life (quality of life which impinge on the liberty and the right to pursue happiness), and property rights of the Plaintiffs. It does so  to the extent it impacts through the laws, public policies, fiscal plans, and/or budgets approved the rights of the bondholders, the rights under collective bargaining agreements, labor legislation, and civil and

61

constitutional rights under the Constitution of Puerto Rico, in addition over essential government services they are entitled to,  and  that the FOMB and the government of Puerto Rico have failed to define pursuant to the PROMESA Act.

15. Given the constitutional rights residents of Puerto Rico have and in particular the right to vote,  Congress cannot create a government structure over the elected Government of Puerto Rico and the Plaintiffs and the residents of Puerto Rico that has the power to restructure the payment of the public debt of Puerto Rico through negotiation and/or the reorganization of the fiscal affairs of Puerto Rico as part of a bankruptcy process and to establish  a fiscal plan and budgets for Puerto Rico's government and government agencies and corporations in open disregard of freedom of expression  and right  to vote of the People of Puerto Rico.

16. Inasmuch as Congress creates and imposes on Puerto Rico a Board with the powers referred to above, including the power to surpass and disregard the will of Puerto Rico´s elected representatives, Congress violates the inalienable rights set forth in the Declaration of Independenceand   the First Amendment rights of the Plaintiffs and the  People of Puerto Rico. Moreover, to the extent that power is exercised and the exercise of that power impinges on the property and liberty (quality of life and the right to pursue happiness) rights of the Plaintiffs as referred to above, their Fifth and Fourteenth Amendment Rights of the Plaintiffs are violated.

17.     Inasmuch as Congress creates and imposes on Puerto Rico a Board with the powers referred to above, including the power to surpass and disregard the will of the People Puerto Rico´s elected representatives, Congress violates Act 600 and the power, including the delegated power to the People of Puerto Rico to exercise a form of self government. Accordingly,  such exercise of

power and authority is null and void and the creation of the FOMB should  be declared unconstitutional.

18.  Moreover, the lack of accountability of the FOMB before the People of Puerto Rico in addition to the fact that the statute was adopted and the members of the FOMB were selected and appointed in open disregard to the freedom of expression, democratic participation, and voting rights of the of the Plaintiffs and the  People of Puerto Rico, is a reckless, dictatorial, racist, and discriminatory exercise of power in violation of the inalienable rights set forth in the Declaration of Independence and the equal protection rights of the People of Puerto Rico under the Fifth Amendment of the Constitution of the USA, and to the extent the pretension of Congress to determine that the FOMB is a territorial entity, under the Fourteenth Amendment of the Constitution of the USA.

19.  To the extent Congress must respect the inalienable rights set forth in the Declaration of Independence and the  First, Fifth Amendment and Fourteenth Amendment rights of the People of Puerto Rico in Puerto Rico, it cannot deprive the People of Puerto Rico of such rights, because its own Constitution prohibits the exercise of such power.

20.  Given the way the FOMB was created and the powers it has in open disregard to the rights of the People of Puerto Rico referred to herein,  the exercise of such powers by Congress and by the FOMB  deprives the Plaintiffs of their inalienable rights set forth in the Declaration of Independence and the  First, Fifth and Fourteenth Amendment rights.

21.  The act of Congress to establish an FOMB and to impose  it on the Plaintiffs and the People of Puerto Rico in open disregard to the freedom of expression and equal protection rights set forth herein, constitutes a violation of the  inalienable rights set forth in the Declaration of

63

Independence and the First, Fifth and Fourteenth Amendment Rights of the Constitution of the USA and accordingly, the creation of that Board should be declared null and void and unconstitutional, just as all acts undertaken by that Board ever since it was established with its members. Thus, the creation of the FOMB should be declared unconstitutional, and the implementation of any and all fiscal plans approved by the FOMB, just as any of its act should be declared null and void, and the proceedings under PROMESA should be stayed.

22.   Accordingly, it is respectfully requested from the Court to declare so through the corresponding judgment, and to order the members of the Board, the Board itself and all of its employees and contractors to return to the Government of Puerto Rico any and all monies paid by the Government of Puerto Rico pursuant to the terms of the PROMESA Act, and to order the government of the USA to account for and pay to the Government of Puerto Rico any sums of money used by the FOMB and/or its employees and contractors that are not returned inasmuch as it must respond for the enactment and imposition over the Plaintiffs and the People of Puerto Rico of an illegal and unconstitutional act.

23.   The failure to reach such conclusion would betray the words of Abraham Lincoln in his Gettysburg Address where he expressed that the government should be of the people, by the people, and for the people.

### C.   THIRD CAUSE OF ACTION: THE UNCONSTITUTIONALITY OF THE FOMB DUE TO THE VIOLATION OF THE DUE PROCESS OF LAW RIGHTS OF THE PLAINTIFFS

1.  The Plaintiffs reassert each and every one of the allegations set forth above.

2. The powers bestowed upon the FOMB by Congress, as exercised and as can be continued to be exercised by the FOMB, have deprived the liberty, life (quality of life which impinge on the

64

right to liberty and the pursuit of happiness), and property rights of the Plaintiffs. It does so to the

extent it impacts through the laws, public policies, fiscal plans, and/or budgets approved the rights

of the bondholders, the rights under collective bargaining agreements, labor legislation, and civil and

constitutional rights under the Constitution of Puerto Rico, in addition over essential government

services they are entitled to and that the FOMB and the government of Puerto Rico have failed to

define pursuant to the PROMESA Act.

3. As set forth before, the FOMB created by Congress through the PROMESA Act has the

power as part of its oversight authority to reject statutes adopted by the legislative assembly of Puerto

Rico, to require changes in the statutes, to reject the budgets approved by the legislative assembly

of Puerto Rico and the fiscal plans adopted by the Government of Puerto Rico, and to establish and

impose budgets and fiscal plans on the Government of Puerto Rico to the extent no agreement is

reached between the Government of Puerto Rico in the FOMB in that respect.

4. Congress provided such powers to the FOMB without any accountability to the Plaintiffs

and the People of Puerto Rico in addition to the fact that the statute was adopted and the members

of the FOMB were selected and appointed in open disregard to the freedom of expression,

democratic participation, and voting rights of the People of Puerto Rico.

5. As set forth above, the Fifth Amendment of the Constitution provides in its pertinent part

that no person shall be deprived of life, liberty, or property without due process of law.

6. The powers granted by Congress to the FOMB are of such extent, level, and magnitude,

and in open disregard to the democratic principles set forth above, and without any accountability

from the People of Puerto Rico, including the power over laws and regulations, budgets, contracts,

and fiscal plans, that the life (quality of life which is a human right), liberty, and property rights of

the Plaintiffs can be and have been adversely affected by the acts of the FOMB, including and not limited to the financial and collective bargaining and labor rights and entitlements of the Plaintiffs and their members.

7. Moreover, within the FOMB, regardless of whether it is a federal or territorial and/or colonial entity, Congress has created an entity in which it has joined executive, fiscal, and legislative powers in open disregard to the constitutional principle of the separation of powers according to which its own constitutional government was created in 1787 and according to which it required the People of Puerto Rico to adopt their own constitution in 1950.

8. The separation of powers in government is part and parcel of the due process of law rights to which all persons are entitled to in the USA and in Puerto Rico, including all of the persons residing in the USA, rights embedded in the Fifth and Fourteenth Amendment[16] of the Constitution of the USA.

9. By merging all of those powers within the FOMB, and in particular without any accountability by the People of Puerto Rico, Congress violates the due process of law provisions of the Fifth Amendment. Likewise the FOMB does so by the exercise of such powers over the Plaintiffs and the People of Puerto Rico.

10. Moreover, the FOMB in its statutory capacity has the potentially conflicting duties and authorities to ultimately control, (over and beyond elected Puerto Rico government officials' decisions) and to legally represent Puerto Rico, creating multiple and potentially or actually conflicting fiduciary duties. Such conflicting duties and authorities disregard the strictest adherence

---

[16]The Fourteenth Amendment is included herein and thereafter to the extent the pretension of PROMESA that the FOMB is a territorial entity stands.

to a substantive and procedural application of due process of law. Without pretending to exhaust all the legal angles of constitutional analysis that this singular situation presents, the FOMB by the statutory definition of its duties and the authority vested upon it, has to determine when and what to investigate, supervise, adjudicate, resolve, and/or decide with respect to the approval or disapproval of fiscal plans and restructuring of the public debt, rescind and/or veto legislation as it may determine to be necessary, and to decide if, when and how to represent the debtor in Title III proceedings. Such broad concentration of functions, power, and authority, without any separation of powers and accountability mechanisms on behalf of the People of Puerto Rico, ultimately deprives the citizens individually and collectively of their quality of life, property and liberty, representing a *prima facie* a conflict of interest of such magnitude that it violates the procedural and substantive due process of law and the equal protection of the laws rights of the Plaintiffs and the People of Puerto Rico.

11. Inasmuch as that is the state of the relationship and power correlation between the FOMB and the inhabitants of Puerto Rico, the FOMB as conceived and created by Congress violates the Fifth and Fourteenth Amendments of the Constitution of the USA.

12. It also violates the due process provisions of the Constitution of the United States inasmuch as Congress has merged the power to investigate, to adjudicate, and to legislate matters over the statutory, constitutional, and contractual rights and entitlements of the Plaintiffs and of the inhabitants of Puerto Rico on one sole government entity without any accountability, oversight, participation, advise, and consent from the Plaintiffs and the inhabitants of Puerto Rico.

13. Considering such violations of the due process right provisions of the Constitution of the USA, as far as the rights of the Plaintiffs and the inhabitants of Puerto Rico are concerned, the FOMB as conceived and created by Congress pursuant to PROMESA should be declared

unconstitutional, null and void, just as any and all acts undertaken by the FOMB ever since it was constituted. Thus, the creation of the FOMB should be declared unconstitutional, and the implementation of any and all fiscal plans approved by the FOMB, just as any of its acts should be declared null and void, and the proceedings under PROMESA should be stayed.

14. Accordingly, it is respectfully requested from the Court to declare so through the corresponding judgment, and to order the members of the Board, the Board itself and all of its contractors to return to the Government of Puerto Rico any and all monies paid by the Government of Puerto Rico pursuant to the terms of the PROMESA Act, and to order the Government of the USA to account for and pay to the Government of Puerto Rico any sums of money used by the FOMB and/or its contractors that are not returned inasmuch as it must respond for the enactment and imposition over the People of Puerto Rico of an illegal and unconstitutional act.

## D. FOURTH CAUSE OF ACTION: THE TERMINATION OF TWO OF THE MEMBERS OF THE BOARD DUE TO CONFLICTS OF INTEREST AND THE URGENT NEED FOR AN INTEGRAL, LEGAL AND FORENSIC AUDIT OF THE PUBLIC DEBT

1. The Plaintiffs reassert each and every one of the allegations set forth above.

2. The FOMB, established under section 101 of PROMESA, does not only have a statutory duty to represent the debtor under section 315, but it sets forth a mandate under the statute that is unavoidably intertwined with the ultimate legislative purpose of PROMESA, which is, or should be, to bring about the economic "stability of Puerto Rico".

3. Moreover, PROMESA Section 104(o) authorizes the FOMB to "investigate the disclosure and selling practices in connection with the purchase of bonds issued by [Puerto Rico and its instrumentalities] for or on behalf of any retail investors including any under representation

68

of risk for such investors and any relationships or conflicts of interest maintained by such broker, dealer, or investment advisor ... as provided in applicable laws and regulations";... See section 104(o).

4. The Plaintiffs believe that the statutory duty to represent the debtor and to bring about economic stability to the debtor includes the fiduciary duty to investigate the practices set forth in section 104(a) to ascertain the validity of the public debt that the creditors want to get paid.

5. Notwithstanding that authority and the fiduciary duty as representative of the Debtor, it was not until May 26th 2017, almost one year after PROMESA was approved, that the FOMB finally adopted the "Procedures Adopted by the Financial Oversight and Management Board for Puerto Rico for Conducting Investigations Pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act".

6. Notwithstanding the authorization and duty to investigate the debt of the Government of Puerto Rico under PROMESA, including the pursuit of legal and forensic audits, it was not until August 2, 2017, that is more than a year after PROMESA was approved, that the FOMB expressed its willingness to "investigate" the lending practices that brought the Government of Puerto Rico to the fiscal crisis in which it is at the present time. However, on March 13, 2017, before pursuing that investigation, the FOMB certified the first Commonwealth's revised fiscal plan allocating the payment of the public debt without verifying its legality and without having undertaken the corresponding public audit or investigation. Furthermore, the fiscal plan was approved without the Government of Puerto Rico having prepared and published a financial statement for the period 2015-2016. In fact, the Government of Puerto Rico has failed to prepare and publish a financial statement since the year 2014.

7.  Despite the willingness of the FOMB to accept in August 2, 2017 to "investigate" the lending practices of the Government of Puerto Rico, prior to that  the Chairman of the FOMB,  José Carrión III,   has  expressed publicly through Puerto Rico´s press that such legal and forensic audit was not necessary, that  it was a waste of time  and that attempts to audit the public debt of the government of Puerto Rico was an issue of left wingers.

8.  Furthermore, the FOMB and the Government of Puerto Rico have continuously failed or refused to perform the legal and  forensic audit of the public debt on the basis of baseless, unfounded,  and meritless reasons.

9.  Moreover, despite the fact that Puerto Rico´s legislature had created a Commission to pursue the legal and forensic audit of the public debt of Puerto Rico in July 2015[17],  that the members of the Commission were designated  in the summer of 2016 and that the members of the Commission prepared two preliminary reports, Governor Rosselló,  soon after  becoming Governor, removed the members of the Commission from their positions. Three of them pursued injunctive relief and on April 6, 2017, the Superior Court of Puerto Rico, San Juan Part, issued a judgment reinstating them as members of the Commission insofar the action by the Governor was illegal and unconstitutional.

10. Soon thereafter the Legislative Assembly of Puerto Rico, controlled by the Governor´s political party, approved a law pursuant to which the statute that created the Commission was derogated, legislation that was thereafter signed by Governor Rosselló, derailing the efforts undertaken at that time to pursue the legal and forensic audit of the public debt.  Such action was  an obvious recognition that the existing government of Puerto Rico has no interest or concern over the

_____

[17]That was the Puerto Rico Commission for the Comprehensive Audit of the Public Credit (the Commission) which was created by Law 97 of 2015.

70

legality of the public debt and the transparency with which public affairs should be managed and were managed by prior governors of Puerto Rico, cabinet members, heads of the Government Development Bank and the legislative assembly of Puerto Rico.

11. The Government of Puerto Rico has neglected the obligation to undertake such audit despite the fact that it is part of the fiduciary duty of the Governor of Puerto Rico and of the Secretary of Justice of Puerto Rico and despite the fact that Section 413 of PROMESA, entitled DETERMINATION ON DEBT, recognized the existence of the Commission created by Puerto Rico´s legislature in 2015 , which  no longer exist as a result of the decision of the existing government to terminate it.

12. Thereafter, the Government of Puerto Rico has not undertaken any action to pursue a legal and forensic audit of the public debt of the Government.

13.  Meanwhile, despite the fact that the FOMB is supposed to execute its duties and responsibilities ethically, without the appearance of impropriety, well aware of the fiscal limitations of the Government of Puerto Rico, and without conflicts of interests, it  hired an Executive Director for a yearly salary of $625,000.00, which is  a yearly salary substantially greater than the salary of the President of the USA which amounts to $400,000.00.  Considering that pursuant to PROMESA  the Government of Puerto Rico must pay that salary, and the financial strains of the government and its debt crisis, the contracting of the Executive Director under such terms by the FOMB,  is unconscionable, unethical, and improper, and in open disregard with the purposes and FOMBjectives that PROMESA purports to have.

14.   The undertaking of a complete legal and forensic audit of the public debt of the government of Puerto Rico is essential to unravel the truth behind the public debt of Puerto Rico to

ascertain how much is legally owed and to ascertain which individuals, private entities, and insurers should be held liable for any illegal financing brokered and provided to Puerto Rico.

15.   Despite the importance of pursuing such audit, and despite the fact that the FOMB is supposed to execute its duties and responsibilities ethically, without the appearance of impropriety, and without conflicts of interests, even though the FOMB, as a result of public opinion pressures, decided to engage in an investigation regarding the public debt of the government of Puerto Rico, instead of pursuing as part of its fiduciary duties as a representative of Puerto Rico a stay in the PROMESA court proceedings until that investigation is undertaken and the truth about the legality of the debt is discovered, it is pursuing a path contrary to that duty.

16.   As part of a reckless disregard with its fiduciary duties and as an example of a lack of commitment to any transparency, the FOMB is allowing the proceeding with negotiations with bond holders and among creditors, and with the consideration and adoption of fiscal plans for the government of Puerto Rico and some of its public entities, the pursuit of further austerity measures over the residents of Puerto Rico, and the consideration of selling or transferring to the private sector important assets and essential services of the government and the People of Puerto Rico, without ascertaining the legality of the public debt and the liabilities of third parties for any and all illegal acts in the issuance and sale of that public debt. In the meantime, two of the members of the FOMB have enormous conflicts of interests that should bar them from holding any positions in the FOMB.

17.     As evidence of the serious conflicts between the FOMB and two of its members, one of the financial entities that has formed part of the process pursuant to which the government of Puerto Rico reached the seventy two billion dollar debt level, Santander Securities, has served as

72

a bond underwriter of the Commonwealth of Puerto Rico and its instrumentalities issuing part of the public debt.

18.     Santander Securities performed underwriting and other services for the Commonwealth and its subdivisions and organizations in connection with the issuance of billions of dollars of securities, including bond issuances for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and the Government Development Bank for Puerto Rico ("GDB"). Santander Asset Management also acted as an investment advisor to certain public corporations. In addition, Santander Asset Management managed mutual funds established pursuant to Puerto Rico law and exempt from the provisions of the Investment Company Act of 1940.

19.     While Santander entities have provided such services to the Government of Puerto Rico, two of the individuals who were appointed as members of the FOMB, Carlos García and José Ramón González, have been related to both, Santander and the Government of Puerto Rico throughout the relevant periods of time during which the public debt arose to $72 billion dollars. Both have been Presidents of the Puerto Rico Government Development Bank, (GDB), the government fiscal agent and financial advisor of the Commonwealth of Puerto Rico, and in other instances have been top corporate executive officials of Santander Bank/Santander Securities, prior to becoming Presidents of the GDB. Moreover, after presiding the GDB, they went back to work for Santander. The fact that Santander has been a financial entity that has been part of bond sales of the Commonwealth of Puerto Rico or of other government entities of the Commonwealth, that form part of the existing public debt of Puerto Rico, cannot be understated nor disregarded as far as the conflict of interests that it reveals with respect to the participation of García and González.

20. The conflict of interest is of such nature, that regardless if the Court decides not to declare unconstitutional the imposition of the FOMB over Puerto Rico and its government, both members of the Board, González and García, should be removed from the FOMB immediately. Otherwise, their participation in the FOMB would constitute a violation of the Due Process rights of the residents of Puerto Rico, including the Plaintiffs. See in that respect Caperton, et al., v. A.T. Massey Coal Co., Inc., supra.

21. As far as the need to pursue the legal and forensic audit of the public debt is concerned, the lack of transparency, existing conflicts of interests, appearances of impropriety, and refusal and/or lack of affirmative action by the FOMB to perform an integral, legal and forensic audit of the debt, is indefensible to the point of breaching the fiduciary and representative duty that the FOMB is called upon to perform pursuant to its duties under Section 315 and specifically under sub-section (b)3 of PROMESA.

22. The FOMB has broad powers of budgetary and financial supervision and the ultimate control over Puerto Rico and its instrumentalities in that respect. Such broad authority within PROMESA's statutory mission, explicitly and implicitly carries a fiduciary duty to manage the present and future economic stability of Puerto Rico with the utmost diligence, thoroughness, and equity. Such fiduciary duty cannot be accomplished without an updated certified audited financial statement, and an independent integral, legal, and forensic audit.

23. Why does the FOMB persists in commencing an economic stabilization plan with a five year fiscal plan incorporating a priori the allocation of the service/payment of a debt that has not even been first and foremost, legally verified and audited is incomprehensible, considering the analysis and findings published so far by independent investigators and the Commission referred to above,

that have pointed out a series of facts that clearly prove the illegality of a substantial part of the public debt of Puerto Rico.

24.    In fact, prior to engaging in any negotiation with any creditor and prior to submitting itself to any adjudication procedures regarding Puerto Rico´s public debt, the FOMB has the fiduciary duty to proceed with that independent audit, not only to ascertain the real amount of the debt, if any, but to go after those liable for any financing provided to the government of Puerto Rico that may be illegal and accordingly null and void, who may then be liable for it.  In fact, the Government of Puerto Rico and the FOMB in its representative capacity have the fiduciary and legal duty to pursue claims for breach of contract, failure to disclose, professional liability, errors and omissions, fraud, RICO, among others, against those liable for pursuing illegal issuance of public bonds by the Government of Puerto Rico. But in order to consider the merits and viability of doing so, the FOMB has failed  to compel the corresponding legal discovery with respect to those financial transactions and to  perform the corresponding legal and forensic  audit which will produce the  evidence needed to ascertain what part of the debt is illegal and which persons and entities are liable for those illegal transactions.

25.  The failure to undertake the independent legal and forensic audit while the FOMB proceeds with fiscal plans and austerity measures that ultimately deprive the People of Puerto Rico and the Plaintiffs of their proprietary,  statutory, and constitutional rights and entitlements, including rights under collective bargaining agreements, constitutes a violation of the due process rights of the Plaintiffs and of the People of Puerto Rico.

26.   On the other hand the conflicts of interests, appearances of impropriety, lack of transparency, and prejudiced postures of the FOMB, through its members, makes the FOMB incapable and disqualifies it from proceeding with such independent legal and forensic audit.

27.   Moreover, the potential payment of the alleged unprecedented amount of the accumulated public debt, impacts the People of Puerto Rico and the U.S. persons living in Puerto Rico, who may be condemned to suffer grievous losses. Dozens of arbitration proceedings have been filed successfully by bond holders against their investment brokers, and others may potentially follow with allegations of breach of fiduciary duty, breach of contracts, failure to disclose, professional liability, errors and omissions, fraud, RICO violations, etc.

28.   An independent legal and forensic audit would have been completed by now if the funds assigned by the Puerto Rican Legislature during the 2013-2017 term to the Commission referred to above had been made available. The preliminary questions that the Commission intended to answer where among other the following:

a) Has the Government of Puerto Rico violated the constitution's balanced budget requirement by using debt to finance deficits?

b) Has the Government of Puerto Rico violated the constitutional debt limit?

c) Does the Government of Puerto Rico's use of "scoop and toss" practices violate the Constitution's prohibition against issuing notes lasting more than 30 years?

d) What effect did the Government´s use of Capital Appreciation Bonds have on the total debt amount?

e) Did the Government´s, and or its advisors and underwriters, comply with relevant U.S. Securities and Exchange Commission (SEC) laws concerning disclosure?

f) At what point did the debt stop being productive and contributing to economic growth?

g) Who may be liable for any of the illegal practices including the professionals, financial entities, and government officials who participated in those transactions and who knew or should have known that the transactions  were illegal and/or that the debt as incurred could not be paid by the Government of Puerto Rico given its financial constraints?

29.     The FOMB is the entity which essentially has the ultimate control and decision making authority over the Puerto Rican finances, and consequently, directly or indirectly controls the present and future economic development of Puerto Rico. Such broad control and executory judgement and power, parallels [and may in instances exceed] executive and legislative authority which ultimately impacts the judicial consideration of this unprecedented case by this singular Title III court.

30. Hence, the approval of a series  of 5 year fiscal plans which can  result in massive emigration, imminent danger of suffering grievous losses, and which includes severe austerity measures to allocate and make viable the service/payments and ultimately to restructure the public debt which has not been even audited nor its legality validated, is not *prima facie*  fiduciary compliant.  Neither does it comply with the constitutional principle of due process of law under the 5th Amendment and under section 1 of the 14th Amendment of the Constitution of the USA to the extent FOMB is a Puerto Rico and not a federal entity.

31.     The FOMB in its statutory capacity has the potentially conflicting duties and authorities to ultimately control, (over and beyond elected Puerto Rico government officials'

77

decisions) and to legally represent Puerto Rico, thus creating multiple fiduciary duties and requiring the strictest adherence to a substantive and procedural application of due process of law. Without pretending to exhaust all the legal angles of constitutional analysis that this singular situation presents, it may be argued that the FOMB, by the statutory definition of its duties and the authority vested upon it, has to determine when and what to investigate, supervise, adjudicate/resolve/decide the approval or disapproval of fiscal plans and restructuring of the public debt, rescind/veto legislation as it may determine to be necessary, and to decide if, when and how to represent the debtor in Title III proceedings.

32. Such broad concentration of functions and authority, consolidated in the FOMB, which ultimately deprives the citizens individually and collectively of their property, represents *prima facie* a conflict of interest that violates the procedural and substantive due process of law of the People of Puerto Rico and of the Plaintiffs.

33. Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes **may not** be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes therefore issued which are payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year, and together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, **exceeds 15 percent of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury internal revenues in the two fiscal years preceding the fiscal year of such**

**proposed issuance.** Emphasis added.  Wherefore, any public debt issued exceeding the restrictions imposed by the Constitution of the Commonwealth of Puerto Rico, must be declared null and void.

34. The U.S. Supreme Court has said in <u>Buchanan v. Litchfield</u>, 102 U. S. 278 (1880) and in <u>Litchfield v. Ballou</u>; 114U.S.190 (1885), that borrowing above a debt ceiling may allow the issuer to declare the debt invalid and, therefore, unpayable. In <u>Norton v. Shelby County</u> 118 U.S. 425 (1886) the U.S. Supreme Court affirmed that; "An unconstitutional act is not law; it confers no rights; it imposes no duties; affords no protection; it creates no office; it is in legal contemplation, as inoperative as though it had never been passed."

35. Given the constitutional rights residents of Puerto Rico have, including the Plaintiffs, Congress cannot create a government structure over the government of Puerto Rico and the residents of Puerto Rico that has the power to restructure the payment of the public debt of Puerto Rico through negotiation and/or the reorganization of the fiscal affairs of Puerto Rico pursuant to which it may and has deprived the People of Puerto Rico of their liberty and property without undertaking beforehand an independent forensic and legal audit of the public debt of Puerto Rico. The determination of  its legality and the pursuit of those liable for any illegal transactions undertaken in violation of any laws and fiduciary duties and against the public interests of the government and the people of Puerto Rico is of utmost importance and must be the primary action that should be undertaken prior to the adoption of any fiscal plans, debt determinations, and debt adjustments. Otherwise, the establishment of a legal framework to pay the public debt would be a violation of the due process of law and accordingly in violation of the Fifth  Amendment of the Constitution of the USA. . To the extent the FOMB  represents the People of Puerto Rico, it has a fiduciary duty in that

respect and to the extent it fails to allow the audit it violates that duty, moreover if part or the totality of the public debt is unconstitutional and/or illegal.

36. Notwithstanding the power of Congress to approve all needy rules and regulations over the territories of the United States, Congress cannot, given the constitutional rights residents of Puerto Rico have, impose on the people of Puerto Rico any fiscal plans, debt restructuring, and/or public debt payment process that may deprive the people of Puerto Rico of their liberty and property without undertaking beforehand an independent   forensic and legal audit of the public debt to determine its legality and to pursue any of those liable for any illegal transactions undertaken in violation of any laws and fiduciary duties  against the public interests of the government and the People of Puerto Rico.  Otherwise, the establishment of that  legal framework to establish fiscal plans and to  restructure or  pay the public debt would be a violation of the due process of law and accordingly in violation of the  Fifth  Amendment of the Constitution of the USA.

37. The Board, as designated and empowered cannot undertake such audit because through its Chairman it has already expressed its opposition to do so, and because  members of the Board that have worked for financial and/or banking entities and/or Government entities that formed part of the sale of the government bonds that created the public debt of  the Government of Puerto Rico. Accordingly, they had and/or have a stake in the public debt controversy, having  a conflict of interest that bars them from participating in any way in the audit process. Otherwise, that would be a violation of the due process of law referred to above inasmuch as the audit, that could have an effect over the liberty and property rights referred to above, would not be the product of a fair and independent process duly protected against ethical violations and conflicts of interests.

38. Notwithstanding the opposition expressed by José Carrión to the audit of the public debt, the need to proceed with it was finally  acknowledged and admitted by the  FOMB as per its determinations in the meeting held on August 4, 2017,  that is, more than eight months after the appointment of its members.

39.  Given the conflicts of interests within the FOMB referred to herein, the appearance of impropriety of its actions, the partiality expressed against an independent legal and forensic audit, and the lack of transparency in which it has conducted its affairs in open disregard to the needs and democratic aspirations of the People of Puerto Rico,  the FOMB should be disqualified from engaging or contracting such audit.

40.  Accordingly, it is respectfully requested from the Court to stay the process pursuant to which any negotiations regarding the payment and/or restructuring of  the public debt or the adjudication thereof is undertaken, until such audit takes place, and to provide for a process pursuant to which that audit will be fairly conducted with the full and fair  representation of the People of Puerto Rico.

41.  The audit should be as wide in scope as possible with enough resources to be able to examine and evaluate not only any and all contracts for the issuance of Puerto Rico government bonds, the use of the money borrowed, the programs and projects undertaken with those funds, any and all legal, accounting and financial matters pertaining to any and all transactions and the socioeconomic, financial, and environmental impact of the use of the funds from fiscal year 1972-73.

42.  Those appointed to proceed with the audit, appointments that should be made with the greatest degree of participation of the residents of Puerto Rico and outside the bounds of partisan politics, should be allowed to establish the method of the audit and should have access to any and all

81

documents, without this meaning a limitation,  not only regarding the particular transactions but also those that served as basis to justify the transactions and the socioeconomic, financial, and technical viability of the transactions.

43.   Given the series of conflicts of interests and the lack of transparency with which the FOMB and the Government of Puerto Rico has acted on this matter, due regard should be given to the fact that the persons who would pursue the audit should be part of a citizens committee and that as part of the designation of its members participants of the public interests should be considered taking into account the widest array of sectors of  Puerto Rico´s  society and of Puerto Rico´s academia as far as its universities are concerned,  in particular in the areas of economics, finance, public administration, statistics, and constitutional law in addition to participation from the labor sector, Puerto Rico´s small business sector, and the cooperative and credit union  sector.

44.  The disregard of such task, would only leave any malfeasance in the issuance of Puerto Rico´s public debt and the use of such funds unpunished, and  would leave  bond holders and in particular not the institutional ones, that is the individual ones,  and those who may suffer cuts in the value of their bonds  without recourse in light of the state of Puerto Rico´s economy and the prospects of not being able to collect from their good faith investments. Such disregard would also leave the wrongdoers  free to enjoy the benefits of their actions and to roam all over the financial and commercial  world without assuming any liability and ready to continue pursuing such conducts and practices when opportunity knocks on their doors.

### E.    FIFTH CAUSE OF ACTION: THE OBLIGATION OF THE GOVERNMENT OF  USA TO ASSUME ITS RESPONSIBILITY FOR THE VIOLATION OF THE HUMAN, CIVIL AND CONSTITUTIONAL RIGHTS OF THE PLAINTIFFS AND THE PEOPLE OF PUERTO RICO AND FOR THE PUBLIC DEBT

1.  The Plaintiffs reassert each and every one of the allegations set forth above.

2.  The ultimate purpose of PROMESA, and accordingly, the intent of Congress,  is to provide for the financial stability, economic development, restructuring of the public debt, and the creation of the proper economic conditions to allow Puerto Rico to have access to financial markets.

3. As part of that ultimate purpose, the FOMB is pursuing the adoption of a series of fiscal plans by the government of the Commonwealth of Puerto Rico and by the promotion of  a series of development projects to be undertaken in Puerto Rico with complete disregard of the democratic participation by the People of Puerto Rico.

4. As set forth before,   the USA is a party to the Charter of the United Nations.

5. As part of being a party to that Treaty the USA made a commitment **to promote through the United Nations with a view to the creation of conditions of stability and well being necessary for peaceful and friendly relations among nations based on respect for the principle of equal rights and self determination of peoples, universal respect for and observance of human rights and fundamental freedoms for all and to  develop self government, to take due account of the political aspirations of the peoples, and to assist them in the progressive development of their free political institutions**, **according to the particular circumstances of each territory and its peoples and their varying stages of advancement.**

6. The objectives of PROMESA cannot be pursued and achieved in open disregard of the obligations assumed by the USA by adopting the Charter of the United Nations**,** and in fact, those obligations and in particular the ones pertaining to the stability, well being of the people of Puerto Rico based on the principle of equal rights and self determination and **universal respect for and**

**observance of human rights and fundamental freedoms for all and to develop self government, to take due account of the political aspirations of the peoples**.

7. For 119 years the USA has failed to comply with those obligations that are embedded in the Declaration of Independence and the revolutionary history of the thirteen colonies, and certainly it has failed to comply with them since 1945 when the United Nations was created.

8.   As set forth above, the government of the USA in violation of its Declaration of Independence, of its Constitution, and in violation of the United States Charter and the Universal Declaration of Human Rights of the United Nations, has deprived the People of Puerto Rico, including the Plaintiffs of the right to exercise their self determination.

9.   In fact, at all relevant times and ever since the end of the Spanish American War in 1898 has exercised complete control over Puerto Rico´s political and socio economic system, but for menial powers delegated over local matters on a step by step basis since the year 1900.

10.   Moreover, the US government has enjoyed that control aiding and abetting  the overwhelming majority of the politicians of Puerto Rico who have achieved any level of political power at the municipal, legislative and executive levels of the Government of Puerto Rico in particular after 1948, and consequentially their executive  and judicial appointees have been and are individuals who have favored in one way or another the colonial relationship between Puerto Rico and the USA.

11.   In the meantime, those same politicians have reaped the benefits of what they earn as government employees and as bureaucrats who control the government budget that include billions of dollars received every year from the government of the USA.

12.  At all relevant times the government of the USA has known such circumstances and has also known the way the local governments of Puerto Rico have mismanaged the public administration of Puerto Rico.

13.  Yet, despite the power that the USA has had over Puerto Rico, but for the prosecution of some government bureaucrats and political leaders in federal court, it has ignored that state of affairs, and its obligations over Puerto Rico pursuant to the Charter of the United Nations and the principles of its Declaration of Independence pursuant to which its Republic is supposed to stand.

14.  That omission and the commission of the crime of colonialism, which is a crime in international law, must and should have consequences, including the payment of reparations to the People of Puerto Rico, which should be subject to another case or forum.

15.  Nonetheless, in this case it has to have  consequences with respect to the public debt. After all, Puerto Rico has been its colony, and as its colony, its public debt has to be part of the debt of the USA, and in 1917 the USA imposed on Puerto Rico the citizenship of the USA, without the People of Puerto Rico having asked for it, and being a citizen of a nation must have a content and a meaning as far as the civil and constitutional rights of a person are concerned.

16.  Congress does not have the constitutional power to shield the government of the USA from  any claims by any  juridical or natural person without due process of law.  Such power would be not only unconscionable, but also tyrannical and contrary to the spirit of the Declaration of Independence of the USA.  If the government´s power come from its people, the government cannot exercise its power to deprive the people from the right to assert actions against the government when the rights of the people are violated by the government.

17.  Moreover, the exercise of such power violates the Constitution and in particular the due process rights set forth in the Fifth Amendment of the Constitution of the USA.  Furthermore, the exercise of such power violates the First Amendment right of the People to freely speak, to peaceably  assemble, **and to petition the Government for a redress of grievances**.  Emphasis added.

18.  Accordingly, and regardless  of the provisions of section 201 of PROMESA, which as far as shielding the Government of the USA from any liability the Plaintiffs assert is unconstitutional for the reasons set forth in this Adversary Complaint,  it is respectfully requested from the Court to include the Government of the USA as a party in this case, not only to assume a position with respect to the constitutional claims made by the Plaintiffs, but also to answer the allegations of the complaint, and to assume any and all constitutional and legal liabilities it should  be compelled to assume  over the public debt of the Government of Puerto Rico and the illegal and unconstitutional imposition of the FOMB  over the Plaintiffs, Puerto Rico,   and its residents.   Those  liabilities  include  the responsibility of adopting any and all   needy rules and regulations that must be undertaken equitably to promote the aspirations of the People of Puerto Rico, their right to self government, well being and progressive  and  democratic  development  and  in  compliance  with  the  constitutional  and  legal principles set forth herein.[18]

---

[18]See in that respect Acevedo-Vilá, supra, note 7, and the argument he sets forth regarding how to the extent the USA wants to exercise plenary powers over Puerto Rico and has done so since 1898, it has a plenary responsibility over Puerto Rico. See also Medina-Fuentes, La deuda odiosa y la descolonización de Puerto Rico (2018), (The Odious Debt  and the Decolonization of Puerto Rico).

### F. SIXTH CAUSE OF ACTION: THE LIMITATIONS OF THE POWER OF THE FOMB AND THE GOVERNMENT OF PUERTO RICO TO DISPOSE OF OR SELL PREPA AND THE ULTRA VIRES INTERVENTION WITH THE ESSENTIAL AUTONOMY OF THE UNIVERSITY OF PUERTO RICO

1.  The Plaintiffs reassert each and every one of the allegations set forth above.

2.  By the second half of the twentieth century, the access to electrical energy became an essential need for homes, agricultural production in an industrial basis, commercial businesses, and manufacturing processes in Puerto Rico.

3.  Moreover, the enjoyment and use of electrical energy is not only an essential service, not acknowledged yet by the FOMB under PROMESA nor by the Government of Puerto Rico as of the filing of this Adversary Complaint, but as part of any source of energy in earth, the access to it is a human right. That is so regardless of the industrial applications necessary to turn sunlight, wind, water, gas, waste, and/or hydrocarbons into electrical energy for its subsequent distribution. As part of any source of energy in earth, the access to it is a human right, and human rights cannot be subject to privatization and/or control for the profit of any particular interests.

4.  Natural resources needed for the enjoyment of the right to life, liberty, and the pursuit of happiness cannot be subject to privatization and/or control for the profit of any particular interests without any public regulation to guarantee the access and enjoyment of those rights equitably, fairly and with due regard to the right we should all have to life, liberty, the pursuit of happiness, in addition to the right to due process of law, in the context of a democratic society.

5.  The PREPA was created in the year 1941 as part of a public policy and the objective of providing electrical energy to the People of Puerto Rico at reasonable costs and fostering the economic development of Puerto Rico. See Puerto Rico Act 83 of May 2, 1941, as amended.

87

6.  The FOMB, as part of the policies and agendas,    intends to pursue  the sale and/or privatization of assets of the Commonwealth of Puerto Rico like the PREPA  to allegedly promote the economic growth and development of Puerto Rico. It  has publicly informed and  anticipated so.

7.  Likewise, the Government of Puerto Rico also intends to do so, and it has submitted to the legislative assembly a bill to proceed with such sale.   That intention was announced by  Governor Rosselló through a ten minute public speech he made on Monday, January 22, 2018.

8.  The plans to sell PREPA as announced by Governor Rosselló go hand in hand with the policies of the FOMB with respect to the economic development, fiscal and budgetary plans and austerity measures the FOMB intends to recommend and pursue and has recommended and pursued.

9.  Notwithstanding such intentions by the FOMB and the Government of Puerto Rico,  the Constitution of Puerto Rico provides in section 19 of Article IV, that **it shall be the public policy of the Commonwealth of Puerto Rico the conservation of its natural resources just as the greatest development and use of them for the general benefit of the community**.  Emphasis added.  Any source of energy, including solar, wind, water, waste  and the production thereof through gas or any other source of energy is a natural resource, that as part of that constitutional mandate cannot be used but for the general benefit of the community and that community is the People and the residents  of Puerto Rico.

10.  Moreover, the Constitution of Puerto Rico, as approved by Congress,  provides in its foreword that the democratic system is fundamental for the life of the Puerto Rican community, and that  it is understood by democratic system a system where the will of the people is the source of the political power, where the political power is subordinate to the rights of men and women and where the free participation of the citizen in collective decisions is assured.

88

11.   As set forth above, the FOMB was created by Congress without any democratic participation from the People of Puerto Rico and without any accountability to the People of Puerto Rico.  Given the moral, ethical, human, political, and socioeconomic rights that the Plaintiffs and the People of Puerto Rico have, and given the democratic principles set forth in Puerto Rico´s Constitution and the public policy over its natural resources set forth therein, to the extent the Court decides that the creation of the FOMB by Congress is a valid exercise of political authority, it is requested from the Court to bar the FOMB from pursuing any policy to dispose of any essential services and/or natural resources and specifically PREPA,  enjoyed by the People of Puerto Rico, through the Government of Puerto Rico and its public corporations, without accounting for the democratic will and participation from the People of Puerto Rico.

12.   The deprivation of that accountability and democratic process on behalf and for the benefit of the People of Puerto Rico would contribute to the lack of transparency, the violation of the due process rights referred to above,  and the lack of participation by the public in all of the decisions being undertaken by the Government of Puerto Rico and the FOMB regarding the adoption of fiscal plans, budgets, public policies, laws,  and regulations, that were not even part of the political platform of the actual ruling party in Puerto Rico.

13.   Furthermore, the political platform on the basis of which Governor  Rosselló ran to become Governor of Puerto Rico did not make any reference to the fact that his government was going to pursue the sale of PREPA.

14.   Moreover, Governor Rosselló was elected by just 41.80% of the people who voted in the election  (660,510 votes), and if the number of voters that were enrolled and had the right to vote that day were considered to determine the amount of democratic support  for his candidacy, the

89

percentage drops to 23%. Data from the Electoral Commission of the Commonwealth of Puerto Rico. Thus, the Government does not have a mandate to pursue the sale of PREPA.

15. Moreover, the Court must contrast the amount of votes obtained by the candidate of Rosselló´s party for governor of Puerto Rico in the years 2008 and 2012 (1,025,965 and 884,775 respectively) with the amount of votes Rosselló obtained to see how the support of his party and its policies has been dwindling. Data from the Electoral Commission of the Commonwealth of Puerto Rico.

16. Governor Rosselló has to comply with the Constitution of Puerto Rico, Constitution he swore to abide by on January 2, 2017 when he took the oath of office.

17. Considering what the Constitution provides with respect to the democratic principles that the People of Puerto Rico chose to adopt as part of their Constitution in 1952, a Constitution that was approved in order to come in effect by Congress, and accordingly is an Act of Congress, and considering the circumstances under which Governor Rosselló was elected and has been governing since January 2, 2017, to allow his government to pursue the sale of PREPA without any transparency, accountability, and the participation by the People of Puerto Rico and the Plaintiffs, two of which are labor unions in PREPA and one is an association of retired employees and pension beneficiaries of PREPA, would be a violation of the freedom of expression rights of the People of Puerto Rico and of the Plaintiffs under the First Amendment, and under the Fifth Amendment of the Constitution of the USA, to the extent that sale would be a disposition of an asset of the People of Puerto Rico without due process of law. Likewise it would be a violation of the equivalent provisions of the Constitution of Puerto Rico (sections 2, 4 and 7 of Article II) and of the other provisions of Puerto Rico´s Constitution set forth above.

18. More so, to allow the sale of PREPA completely or in part, without the scrutiny requested by the Plaintiffs would be unconscionable considering not only the existing socioeconomic circumstances of Puerto Rico, but also the way its population is subject to certain limitations as far as the production and distribution of energy is concerned.

19. Puerto Rico is an island geographically located far from any continental land. Given such circumstance, there is no feasible economical or political possibility for its inhabitants to connect with another grid or energy generation system. Thus, the People of Puerto Rico are subject to whoever produces and distributes electrical energy in the island to be able to receive such essential service, service that if it is provided by a private entity, it grants that entity a virtual monopoly power over that production and distribution, in particular if such economic power is unfettered and subject to no regulation.

20. To grant such control to any entity in the private sector would further place the population of Puerto Rico and all the components of its economy and of its government at the municipal and national levels to depend entirely and for the foreseeable future on the control of that essential service by an entity whose main concern will be profit.

21. Considering such circumstances, the intangible assets of PREPA, and in particular the control over the market within an island in which the population does not have any plausible choices for electrical energy generation and distribution, far outweigh the value of its tangible assets which after Irma and Maria have been at least greatly damaged , diminishing significantly its market value.

22. In light of such circumstances, the act of privatization or sale of the right to exploit the electrical energy needs of the People of Puerto Rico in open disregard to the socioeconomic and political circumstances in which Puerto Rico is as set forth in this Adversary Complaint would be

91

absolutely unconscionable and as such null and void. It is also unconscionable to the extent the intangible assets of PREPA and in particular the control over the market and the energy needs of the population cannot be subject to any form of appraisal.

23. Accordingly, the Plaintiffs contend that the proposed sale of the assets of PREPA announced by the government should be strictly scrutinized by this specially appointed court and be subject to the due process the Plaintiffs demand.

24. Furthermore, it is respectfully requested from the Court to bar Governor Rosselló from pursuing the sale of PREPA or of any assets of the Government of Puerto Rico related to any of its natural resources and/or essential services without pursuing a transparent, public, and meaningful process pursuant to which the public, that is, the People of Puerto Rico, are duly and fully informed as to what the government intends to do, and pursuant to which the People of Puerto Rico are given a meaningful opportunity to express their consent or dissent to what the government intends to do.

25. Accordingly, it is respectfully requested from the Court to bar the FOMB and the government of Puerto Rico from pursuing the sale of PREPA and to compel the FOMB and the Government of Puerto Rico to provide for the corresponding participation by the People of Puerto Rico prior to the execution of any sale of PREPA.

26. On the other hand, as set forth before, the FOMB was created by Congress without any democratic participation from the People of Puerto Rico and without any accountability to the People of Puerto Rico.

27. That lack of accountability has been lately highlitghted by the way PREPA, which is under the jurisdiction of this Court as a bankrupt entity, has hired a new Executive Director at a yearly salary of $450,000.00 plus benefits and incentives, as if there were no capable persons in

Puerto Rico to occupy that position at a reasonable salary.  Such contract, by a bankrupt entity under

Title III of PROMESA, way above the salary of cabinet members of the government of the USA,

without any action on the part of the FOMB to scrutinize such appointment clearly shows the lack

of transparency with which the members of the FOMB have been exercising the oversight delegated

by Congress.  Likewise, it also shows the lack of transparency with which the members of the

Executive Board of PREPA, appointed by  Defendant Ricardo Rosselló-Nevares, and the

Government of Puerto Rico have been managing PREPA as part of a gross mishandling and a failure

to comply with their fiduciary duties.

28.    Moreover, such contract, precisely because PREPA is bankrupt and because of the

amount of money the appointed Executive Director will be paid, is unconscionable, and given the

omissions and violation of fiduciary duties  by the FOMB, PREPA´s Board of Directors, and the

Government of Puerto Rico  should be scrutinized and voided by this Court within the scope of the

power granted to this Court by the PROMESA Act.

29.    Furthermore, on the basis of the facts set forth herein, and precisely because of the lack

of transparency, accountability, and violation of fiduciary duties referred to above by the FOMB, the

Board of Directors of PREPA, and the Government of Puerto Rico, it is respectfully requested from

the Court to bar the FOMB and the government of Puerto Rico from pursuing the sale of PREPA and

to compel the FOMB and the Government of Puerto Rico to provide for the corresponding

participation by the People of Puerto Rico prior to the execution of any sale or disposition  of the

assets of  PREPA.

30. Similarly, the FOMB and the Government of Puerto Rico are intervening with another

one of  the most valuable assets of Puerto Rico  and the opportunity that the People of Puerto Rico

93

have to overcome the present socio-economic crisis:  the continued higher education and research

facilities provided by the University of Puerto Rico (hereinafter U.P.R.). The autonomy that the

U.P.R. has by virtue of law is essential to continue and strengthen the higher education that it offers.

Arbitrarily increasing the tuition fees, reducing the operational budget and closing campuses by

means of an imposed fiscal plan, to repay an uncertain and unaudited public debt, in gross disregard

to the poverty level of approximately 50% of the population and a labor force participation in the

lows 40%, is unconscionable and beyond any just law and equity. But the conflict taking place is not

confined to higher tuition fees, reduced budget and closing college campuses, as it will intendedly

or unintendedly inflict damage on the U.P.R.  by countering its prospects for growth and social

inclusion. It  will result also, as with PREPA and others to come, in the FOMB proposing the popular

and erred improvised "solution" that when something in government is broken the only alternatives

are to throw it away, shut it down, or  to privatize it in disregard to the duty to figure out what is

wrong and how it can be fixed. The FOMB and the Government of Puerto Rico must be stopped from

illegaly weakening, breaking down,   and selling one of the  most valuable and precious institutions

of Puerto Rico  in detriment to the future of the People of Puerto Rico.

## VI.  PRAYER OF RELIEF

Wherefore it is respectfully requested from the Court:

1) To declare the imposition of the FOMB over Puerto Rico by the US Congress as an illegal,

void, and unconstitutional action in violation of the Declaration of Independence of the USA, the

First, Fifth, and Fourteenth Amendment of the USA, the Charter of the United Nations, the

Declaration of Human Rights of the United Nations, and the International Covenant of Civil and

Political Rights;

2) In the alternative, to the extent the Court denies the remedies set forth above, to remove two of the members of the FOMB, José Ramón González and Carlos García, due to the conflicts of interests they have that impede their participation in the FOMB, and as a result of the fact that due to those conflicts and given the powers of the FOMB, their participation in that Board constitutes a violation of the due process of law;

3) To stay the adoption of any and all fiscal plans and any and all negotiations of the payment and/or adjustment of the public debt of Puerto Rico until after an independent, integral, legal, and forensic audit of such debt is undertaken to determine what part of the debt is actually illegal, and so those persons and entities who are responsible for proceeding with the illegal sale of bonds be held accountable for such transactions and liable for the consequences of such sales;

4) To include the government of the USA as a party to this case to not only assume a position with respect to the constitutional claims made by the Plaintiffs, but also to answer the allegations of the complaint, and to assume any and all constitutional and legal liabilities it should be compelled to assume over the public debt of the government of Puerto Rico and the illegal and unconstitutional imposition of the FOMB over the Plaintiffs, Puerto Rico, and its residents; and

5) To bar the Government of Puerto Rico from disposing of the totality and/or part of the Puerto Rico Electrical Power Authority without complying with the Constitution of Puerto Rico and the right of the Plaintiffs and the People of Puerto Rico to participate in the decisions regarding the preservation, management and disposition of its most important essential service and natural resource, in addition to the water resources.

6) To provide any other remedy at equity and/or at law it may deem appropriate on the basis of the facts and claims asserted herein.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico this 23rd   day of April, 2018.


S/ROBERTO O. MALDONADO NIEVES
ROBERTO O. MALDONADO NIEVES
U.S. Id. 202209
C/7 N.E. #344, Suite 1-A
Esq. Franklin D. Roosevelt
San Juan, Puerto Rico  00921
Tel.: 782-3221 // 792-5622/ Fax 273-7250
E-mail: romn1960@gmail.com